COMMONWEALTH *vs.* ROBERT A. PATON.

No. 04-P-357.

Plymouth. January 6, 2005. - March 31, 2005.

Present: ARMSTRONG, C.J., CYPHER, & KANTROWITZ, JJ.

*Criminal Harassment. Wilful, Wanton, or Reckless Conduct. Malice. Emotional Distress.*

The evidence at the trial of a complaint charging the defendant with criminal harassment, in violation of G. L. c. 265, § 43A(*a*), was sufficient to prove that the defendant's conduct was wilful [218-219] and malicious [219-220], and that the victim suffered substantial emotional distress that was reasonable under the circumstances [220-221].

COMPLAINT received and sworn to in the Hingham Division of the District Court Department on March 12, 2002.

The case was heard by *Thomas S. Barrett*, J.

*Adam T. Narris* for the defendant.

*Kelly-Anne DeFao*, Assistant District Attorney, for the Commonwealth.

CYPHER, J. After a jury-waived trial, a District Court judge found the defendant guilty of criminal harassment, G. L. c. 265, § 43A(*a*). The defendant claims that the evidence was insufficient to show that he acted wilfully and maliciously toward the victim, that his conduct would not have caused a reasonable person to suffer substantial emotional distress, and that the judge should have allowed his motion for a required finding of not guilty. We affirm the conviction.

*Factual background.* Early one evening in June, 2001, the victim, a college student from Norwell who was working that summer as a waitress at a local club in Hingham, saw the defendant in the crowded bar area looking for a friend. The victim joked with him about the lack of seating and told him that there might be more room later. The defendant returned a

couple of hours later but the bar was still full. The victim again joked with the defendant about the lack of seating and told him to try again. The defendant then left and did not return again that evening.

Although he had not been seen in the bar before, the defendant became a regular visitor during the next several weeks. On more than twenty occasions he asked the bartender whether the victim was working. If she was not working, he would leave immediately. If she was working, he stayed and ordered a soda or tonic water. His demeanor toward the victim, however, had changed.[1] In their first encounter, the defendant talked with the victim and appeared pleasant. On these subsequent occasions, he did not communicate with her, but paced back and forth, stared at her, and remained in the bar for some time. This caused the victim to feel apprehensive and uncomfortable, prompting her to go out of her way to avoid face-to-face encounters with the defendant. The victim characterized the experience as "nerve-wracking," and was particularly concerned because she often worked until midnight and walked alone to her car in the parking lot. Twice she called in sick because she did not want to "deal with it." In early July, the victim's mother contacted the Norwell police department.

While the precise circumstances and date do not appear in the record, management of the club, with the victim's approval, asked the defendant to leave and escorted him from the bar. The victim observed that he used a telephone in the lobby before leaving the club. The defendant then walked to the parking lot, but not directly to his car. He went to the victim's car, which was parked in a location out of the direct path to the defendant's car, and stood next to the driver's side door and looked inside. That day the victim had purchased a new car, driven it directly to work, and parked behind a dumpster because the lot was

---

[1] There is only one suggestion in the record that there might have been some indirect communication between the defendant and the victim. Defense counsel asked the victim: "There [were] no messages passed between [the defendant] to you by any third party either, is that fair to say?" The victim responded: "None that I would consider credible. I don't do third, you know, third party stuff." The bartender testified that he never was asked to pass any messages to the victim. Accordingly, we discern nothing in the record explaining the defendant's change in demeanor.

nearly full. She stated that only her college sticker, which she attached to the back of the car after purchasing it, would identify the car as belonging to her.

After being escorted from the bar, the defendant never returned, but began appearing unexpectedly in other places. On one occasion, the victim was in a store on the upper level of the South Shore Plaza shopping mall in Braintree. Just before she left the store, she noticed the defendant on the opposite side of the atrium walking back and forth. He was alone and was not carrying any shopping bags. The victim waited until the defendant was positioned so that he would not notice her, at which time she left surreptitiously, sneaking out a side door. The victim visited the mall frequently, but had not seen the defendant there previously.

Approximately two and one-half weeks after the defendant had been escorted from the bar, the victim drove into a Dunkin' Donuts in North Weymouth on her way to work. As she turned into the driveway, she saw the defendant in her rear view mirror driving directly behind her. Instead of stopping, she drove around the drive-through and returned to the highway. She saw the defendant drive into a parking space.

In the midday of August 13, 2001, the victim went to her gym in Norwell. She started to work out on an elliptical machine. The defendant appeared at the machine right next to her, even though the gym was not crowded and there were at least ten other elliptical machines open for use, as well as a large number of treadmills and stationary bicycles. The victim had been a member of the gym for over five years and had never seen the defendant there. He did not say anything to her. The victim got off her machine and called her parents. Police arrived and told the defendant to stay away from the victim. On her way out of the gym, the victim noticed that the defendant's car was parked next to hers in the parking lot.

Norwell police talked to the defendant the day after he had appeared at the gym. He told them that he had not seen the victim at the gym because he did not know her, and would not know her if she were standing beside him. He admitted going to the bar and ordering club soda, but he denied that he had asked for the victim. He also told the police that the victim was harass-

ing him and that they should tell her to stop or he would sue her. The police advised him to stay away from the victim.

*Discussion.* The defendant argues that the evidence was legally insufficient to convict him of criminal harassment and, in particular, the evidence was insufficient to show that his encounters with the victim were not accidental; that the Commonwealth failed to prove malice; and that his conduct would not have caused a reasonable person to suffer substantial emotional distress.

We must determine whether the evidence of the defendant's conduct is sufficient, according to the principles of *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979), for a rational trier of fact to find the elements of criminal harassment beyond a reasonable doubt.[2]

General Laws c. 265, § 43A(*a*), inserted by St. 2000, c. 164, provides, in relevant part:

> "Whoever willfully and maliciously engages in a knowing pattern of conduct or series of acts over a period of time directed at a specific person, which seriously alarms that person and would cause a reasonable person to suffer substantial emotional distress, shall be guilty of the crime of criminal harassment . . . ."

The harassment statute tracks the stalking statute, G. L. c. 265, § 43(*a*), except that the stalking statute contains the additional element of making a threat to induce fear of death or bodily injury. *Commonwealth* v. *Clemens*, 61 Mass. App. Ct. 915, 916 n.3 (2004).[3]

The defendant first argues that the evidence was insufficient

---

[2]We are aware of only a single Massachusetts appellate decision interpreting the criminal harassment statute. *Commonwealth* v. *Clemens*, 61 Mass. App. Ct. 915 (2004), was decided after the trial in this case and does not address the issues raised by the defendant here.

[3]General Laws c. 265, § 43(*a*), as amended through St. 1996, c. 298, §§ 11 and 12, states, in relevant part:

> "Whoever (1) willfully and maliciously engages in a knowing pattern of conduct or series of acts over a period of time directed at a specific person which seriously alarms or annoys that person and would cause a reasonable person to suffer substantial emotional distress, and (2) makes a threat with the intent to place the person in imminent fear of death or

to show that his conduct was wilful rather than accidental.[4] Wilful conduct is "intentional rather than accidental." *Commonwealth* v. *Luna*, 418 Mass. 749, 753 (1994), and cases cited. See *Commonwealth* v. *McDowell*, 62 Mass. App. Ct. 15, 22 (2004). The defendant's more than twenty appearances in the bar cannot be viewed as accidental. Each time he asked for the victim by name and would remain only if she was working. After he was ejected from the bar, the circumstances of his subsequent appearances, particularly those where he recognized the victim's car, indicate that he had acquired specific knowledge of the victim's whereabouts, and that he intended to continue the pattern of appearing to the victim.

Next, the defendant argues that his conduct cannot be viewed as malicious, asserting that he did not act out of "cruelty, hostility, or revenge," as those states of mind have been described to show malice toward the owner in cases of malicious damage to property. See, e.g., *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 443 (1983). See also *Commonwealth* v. *McDowell*, *supra*. Those states of mind also suggest conduct that is malicious in stalking cases. Compare *Commonwealth* v. *Jenkins*, 47 Mass. App. Ct. 286, 290-291 (1999).

We need not be confined to only those particular states of mind in this case. The fundamental meaning of malice has been described as "characteriz[ing] all acts done with an evil disposition, a wrong and unlawful motive or purpose; the wilful doing of an injurious act without lawful excuse." *Commonwealth* v. *York*, 9 Met. 93, 104 (1845). Black's Law Dictionary 977 (8th ed. 2004) defines a "malicious act" as an "intentional, wrongful act performed against another without legal justification or excuse," and "implied malice" as "[m]alice inferred from a person's conduct."

The defendant made no explicit threats and, after that first evening in the bar, never even spoke to the victim, so there is no verbal basis from which to assess his conduct. However, the defendant's behavior alone was sufficient in this case for a

bodily injury, shall be guilty of the crime of stalking . . . ."

A further amendment, through St. 1997, c. 238, §§ 1 and 2, did not affect this portion of § 43(*a*).

[4]The defendant did not testify.

rational trier of fact to conclude that the defendant had acted maliciously. The defendant's staring at the victim in the bar without speaking and then unexpectedly appearing in proximity to her in other places had an ominous, menacing, even sinister quality that caused the victim anxiety and apprehension. Conduct "directed at a specific person, which seriously alarms that person," is proscribed by the criminal harassment statute. See G. L. c. 265, § 43A(a). The defendant's acts were injurious without justification and demonstrated cruel, hostile, and retaliatory or revengeful purposes. Evaluated under the foregoing principles, they constitute legally malicious conduct.[5] The defendant's persistence in initiating such encounters even after he was advised that the victim found them alarming further illustrates that his purpose was not benign.

The defendant also argues that even if the victim was subjectively seriously alarmed by his conduct, her alarm was objectively unreasonable. The criminal harassment statute requires, as does the stalking statute, that the conduct would cause a "reasonable person to suffer substantial emotional distress." "[S]ubstantial emotional distress" is not defined in the statute. We are not aware of any Massachusetts appellate decision, nor has the defendant cited any, that defines such a level of emotional distress. We reject the defendant's urging that we adopt the standard of "severe" emotional distress employed in tort law, and articulated in *Agis* v. *Howard Johnson Co.*, 371 Mass. 140, 144-145 (1976). Because the term "substantial" appears in two similar criminal statutes, we think the Legislature meant something different than the standard for emotional distress in tort law. "When a statute does not define its words we give them their usual and accepted meanings, as long as these meanings are consistent with the statutory purpose. . . . We derive the words' usual and accepted meanings from sources presumably known to the statute's enactors, such as their use in other legal contexts and dictionary definitions." *Commonwealth* v. *Zone Book, Inc.*, 372 Mass. 366, 369 (1977).

---

[5]Contrary to the defendant's urging that his acts could just as likely be seen as a "clumsy attempt to meet a girl that he had had a pleasant conversation with," there is nothing in this record that demonstrates he sought to establish or pursue an open and friendly relationship with the victim.

Dictionary definitions are sufficient to interpret substantial emotional distress. "Substantial" is defined as "considerable in amount, volume, or worth." Webster's Third New Intl. Dictionary 2280 (3d ed. 2002). In addition, Black's Law Dictionary 1428 (6th ed. 1990) states that "substantial" is "[s]ynonymous with material." "Emotional distress" is defined as "[a] highly unpleasant mental reaction (such as anguish, grief, fright, humiliation, or fury) that results from another person's conduct . . . ." Black's Law Dictionary 563 (8th ed. 2004).

From the victim's expressions of anxiety and fear of being alone and encountering the defendant, and from the evidence of interference with her work and normal activities, we conclude the victim was caused substantial emotional distress by the defendant's conduct and that such distress was reasonable in the circumstances. A reasonable person would be greatly disturbed by, and fearful of, the defendant's menacing and unexpected appearances, which were material invasions of the victim's mental tranquility.

We conclude that the evidence and reasonable inferences drawn from it, according to the well-known principles stated in *Commonwealth* v. *Dostie*, 425 Mass. 372, 375-376 (1997), were sufficient to satisfy the requirements of *Commonwealth* v. *Latimore*, 378 Mass. at 677-678. The defendant's motion for a required finding of not guilty properly was denied.[6]

*Judgment affirmed.*

---

[6]The defendant's conflicting statements and denials to the police may be interpreted as consciousness of guilt. Evidence of consciousness of guilt may be considered with other evidence in establishing guilt. *Cramer* v. *Commonwealth*, 419 Mass. 106, 111 (1994), and cases cited.