COMMONWEALTH vs. DENNIS G. O'NEIL.

No. 05-P-142.

Hampshire. December 8, 2005. - September 7, 2006.

Present: CYPHER, TRAINOR, & GRAHAM, JJ.

*Criminal Harassment. Wilful, Wanton, or Reckless Conduct. Emotional Distress.*

At the trial of an indictment charging criminal harassment in violation of G. L. c. 265, § 43A(*a*), the evidence was sufficient to permit a rational trier of fact to find the elements of that crime beyond a reasonable doubt, where the defendant's conduct in sending seven letters to the victim while he was incarcerated was both wilful and malicious, in that the defendant continued to do so after being served with a no trespass order and being told by prison officials that he should have no contact with the victim or her family, where the defendant's conduct was intentional and without justification or mitigation, and where any reasonable person would have foreseen the actual harm that resulted [290-293]; further, testimony by the victim and her parents demonstrated that the victim was seriously alarmed by the defendant's letters, and any reasonable person would experience severe emotional distress if subjected to such similar circumstances [293-294].

INDICTMENT found and returned in the Superior Court Department on August 5, 2003.

The case was heard by *Mary-Lou Rup*, J.

*William A. Korman* for the defendant.

*Steven Greenbaum*, Assistant District Attorney, for the Commonwealth.

TRAINOR, J. The defendant, Dennis G. O'Neil, was indicted by a Hampshire County grand jury, charging him with one count of criminal harassment in violation of G. L. c. 265, § 43A(*a*). The defendant waived his right to a jury trial and proceeded to trial before a judge of the Superior Court. His motion for a required finding of not guilty at the close of the Commonwealth's case

was denied, and he was found guilty at the conclusion of the trial.[1]

This case raises questions regarding the required state of mind for proving wilful and malicious conduct pursuant to G. L. c. 265, § 43A(a), and the requirements for proving substantial emotional distress pursuant to that same statute.

*Facts.* In August and September, 2002, the victim's family home in Amherst received a number of collect telephone calls that were placed from the Hampshire County jail. In January, 2003, the family residence began receiving telephone calls from Bridgewater State Hospital. No one living at the residence knew anyone at either institution. Since none of these calls were accepted, the identity of the caller was not known to the victim's family. However, it was later determined that the defendant was incarcerated at the Hampshire County jail in September, 2002, and at Bridgewater State Hospital in January, 2003.

Beginning in January, 2003, the victim and her family began receiving a series of letters from the defendant.[2] There were a total of seven letters received by the victim's family. The letters presumed a familiarity with the victim, but the victim testified that, other than attending the same high school, she had never had any social interaction with the defendant.

In the first letter, postmarked January 25, 2003, the defendant asked the victim to assist him by sending letters to certain unnamed persons and specifically asked that the victim contact a particular judge and let him know that she was concerned about the defendant. The letter ended with this disturbing and recurring sentiment: "Nobody understands what it will take to make you happy like I do. I know this letter is not very good, but in the future you will see how much I care about you." The next letter was postmarked February 3, 2003. In that letter, the defendant apologized for the inappropriate content ("it was not

---

[1]The defendant was sentenced to two years of probation with specific conditions including that he (1) have no direct or indirect contact with the victim or her family; (2) report to the probation department as directed; (3) participate in a counseling program deemed appropriate by the probation department; and (4) reside with his parents until further order of the court.

[2]Most of the letters were addressed to the victim, but one was addressed to the victim's father and another was addressed to the family.

the most noble letter in the world") of a letter the defendant had asked the victim to forward to a neighbor of his. The letter concluded with the defendant telling the victim that he had added her name to his telephone list and that he would call her house the following Monday.

The next letter addressed to the victim was postmarked April 22, 2003. The defendant's obsessive tone and fabricated familiarity with the victim were becoming more apparent.[3]

> "I know I've acted pretty inconsiderately towards you on a few different occasions now but I never meant to. I feel bad that I offered to buy you that shot of alcohol and I'm proud of the way you handled yourself. I'm never going to drink again or offer any alcohol to anyone. I know that you didn't tell anybody that I was mean to you at the bar. I trust you to be responsible with information about me more than I trust anybody else. That's why I'm asking you for your help. . . . The safest way to do that would be for you to come and visit me. I'd love to see you and you don't have to hug me or anything.

> "Like I said I don't trust anybody like I trust you . . . . I know that you care more about doing what is right than anyone else does that's why making sure you are safe is my first priority. . . . I know right now you don't have the greatest connections to the things you need and it's frustrating to be stuck here where I can't do much to help you out. Anything you do to help me out will be greatly appreciated. If you want to write me a letter to let me know how you feel that would be real nice."

On April 23, 2003, while he was incarcerated at the Hampshire County jail, the defendant was served with a "no trespass" order concerning the victim's home. The defendant was told at the time that he should have no contact with the persons listed in the order and that he should not attempt to contact them.

Nevertheless, the victim's father received a letter postmarked May 10, 2003. In the letter, the defendant told the victim's father that he appreciated the fact that the father was helping the victim because other than the father and the defendant there

---

[3]The victim had no memory of the purported incident described in this letter.

were no other "people that will help her out unconditionally." The defendant informed the father that he cared more about the victim

> "than I care about anybody else and I care about her more than anybody else does. Since I'm going to be doing more to help her in the future than anybody else when somebody does something to hurt me they are hurting her as well. I'll teach her skills that nobody else will skills that will make her feel more confident about herself. I know she cares more about doing the right thing than anybody else does that's why I know she had no idea what kind of danger she will be putting me into if she goes through with the complaint when she filed it . . . . I won't ask her to waste her time doing things that she won't learn anything positive from like other people have and will. [The victim] is more complicated than anybody else I know and nobody understands her, what is best for her or how to keep her safe like I do. I hope you will help me to convince her to drop this complaint that's what's best for her, for me, for you, for everyone."

The defendant told the victim, in a letter postmarked May 12, 2003, that he wanted her to help him get out of jail and not to do anything to keep him in it. He told her that he would not "bother" her in the future and that he did not mean to in the past. He then stated, "I still want to be friends with you. If anybody ever thinks about trying to bother you in the future I will handle defending you a lot more responsibly than the courts will."

He again asked the victim to drop her complaint because he would not allow himself to be strip searched and would either be "beat up or sent to Bridgewater."[4] Despite the fact that this letter concluded with the defendant claiming that he was not "obsessed" with the victim and would make the best of the situation if she did not want to spend time with him, he prefaced that sentiment with the observation that "[i]n the long run I will have made your life easier than anybody else will because I will have bent less than anybody else will have. I'll die for principal [*sic*] if I have to."

---

[4]The defendant was apparently obsessed with a fear of being strip searched and mentioned it repeatedly in his letters.

A month later, the victim received a long and rambling letter. In it, the defendant informed her that he thought "about [her] all day long it's not like I forgot about you." The defendant further commented that

> "the less people know about someone's plan's for the future, where they might be and who they might be dealing with the stronger that person is and the better able they are to protect themselves and others. . . . The less people associate us together the better which is why I have hesitated for as long as I have to write you on my visitors list."

Despite this observation, the defendant informed the victim that he wanted her to visit him. He explained that he would allow himself to be strip searched so that they could sit together in the same room, and if he did not allow himself to be searched, they could nevertheless see each other through a pane of glass and talk on a telephone. He again asked her to help him by dropping her complaint. He reminded her that

> "[t]here isn't anybody else that has thought of better ways to protect you or acquire the things you will need in the future. Nobody else is going to teach you all the skills I plan on teaching you. Lots of guys are attracted to you but they don't care about being your friend like I do. I know there isn't anybody else that's as enthusiastic about doing what's right like we are. The more you help me out the more comfortable our lives will be. . . . [I]f you come see me and help me with a few things when I get out I will be more prepared than I would have otherwise been. . . .
>
> "The sooner you start to work together with me the more comfortable our lives are going to be. No matter what these people throw at me I'm only going to let them push me so far and that's why I'm a much better investment for you than anyone else. . . .
>
> "When you or hopefully we are sitting back with better things, better protected, with more secure futures than anyone else, you will be very glad that you helped me out."

The last letter was addressed to the victim's family. Its

postmark was unreadable. The defendant acknowledged to the victim's parents that he might have "lost control" in his second letter postmarked from Bridgewater State Hospital. Although he lost control "less than anyone else does," he understood why the parents might have been concerned about their daughter. The letter ended with the defendant observing that

> "[b]oth of you aren't always going to be around to look after [the victim]. I know there is no guy that cares about her as much as I do I'll say it again anything that anybody does to hurt me is hurting her as well. I understand that this complaint is in the hands of the police now and maybe even if you tried you couldn't stop them from going through with it but all I'm asking is that you try."

As previously stated, the victim testified at trial that while she and the defendant attended the same high school, they never had any contact with each other. She had no idea why he had contacted her.[5] She thought that the first letter was "very weird" and "really weird." She testified that the February letter was "very alarming" and concerned her because she had no relationship with the defendant. She was particularly concerned because the defendant had placed her name on his telephone list so that he could call her house. As a result of receiving the February letter, the victim wrote to Bridgewater State Hospital and requested that the defendant's letters be stopped and that his telephone calls be blocked.

The April letter was disturbing because the defendant referred to his previous inappropriate behavior toward the victim in a social setting. The defendant had claimed that he had offered to buy her a drink. The victim had no memory of any such situation and had no memory of ever having any contact with the defendant. In March, 2003, the victim again wrote a letter, this time to the house of correction, requesting that mail and telephone calls from the defendant be blocked.

The victim testified that the May letter was "still very upsetting," particularly the defendant's apparent intention to contact her upon his release from prison. Comments contained in the

---

[5]The defendant apparently saw her picture and got her name from their high school yearbook.

defendant's June letter made the victim "very scared" and "terrified." Her parents testified that during this time they observed their daughter to be extremely upset, very frightened, and concerned for her safety.

*Discussion.* The defendant argues that the evidence was insufficient to prove that he wilfully and maliciously engaged in a pattern of conduct prohibited by G. L. c. 265, § 43A(*a*).[6] We must determine whether the evidence is sufficient for a rational trier of fact to find the elements of criminal harassment beyond a reasonable doubt, keeping in mind that the evidence is viewed in the light most favorable to the Commonwealth. *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979).

The Commonwealth must prove that the defendant committed not less than three separate incidents of wilful and malicious conduct specifically directed at the victim, *Commonwealth* v. *Welch*, 444 Mass. 80, 89 (2005); *Commonwealth* v. *Clemens*, 61 Mass. App. Ct. 915, 916 (2004); that the victim was seriously alarmed by this conduct; and, finally, that a reasonable person would have suffered substantial emotional distress as a consequence of this conduct.

The defendant correctly argues that wilful conduct must be "intentional rather than accidental." *Commonwealth* v. *Paton*, 63 Mass. App. Ct. 215, 219 (2005), quoting from *Commonwealth* v. *Luna*, 418 Mass. 749, 753 (1994). He argues further, however, that wilfulness requires not only that he intend the conduct, but also that he intend its harmful consequences. It is clear that "the modern definition is that 'wilful means intentional' without making reference to any evil intent." *Commonwealth* v. *Luna, supra.* See *Adoption of a Minor*, 343 Mass. 292, 297 (1961) (term "wilfully" only requires actor to intend conduct; no ill will or malevolence required). Here, the letters

---

[6]General Laws c. 265, § 43A(*a*), as inserted by St. 2000, c. 164, provides, in relevant part:

> "Whoever willfully and maliciously engages in a knowing pattern of conduct or series of acts over a period of time directed at a specific person, which seriously alarms that person and would cause a reasonable person to suffer substantial emotional distress, shall be guilty of the crime of criminal harassment . . . ."

written by the defendant were sent to the victim's home. The letters specifically asked for her help in assisting the defendant with his criminal cases as well as her assistance in planning their life together after his release from prison. The victim twice asked the authorities to block any further telephone calls or letters from the defendant. The defendant continued sending letters after being served with a no trespass order and being told by prison authorities that he should have no contact with the victim or her family. The defendant's conduct was wilful and not accidental.

The defendant next argues that malice requires the Commonwealth to show that his "conduct was 'motivated by cruelty, hostility, or revenge.' " *Commonwealth* v. *Jenkins*, 47 Mass. App. Ct. 286, 291 (1999), quoting from *Commonwealth* v. *Armand*, 411 Mass. 167, 170 (1991). The defendant's theory would require the Commonwealth to prove that on at least three occasions, he intended to "seriously alarm or annoy" the victim and that he was motivated by a state of mind comprised of "cruelty, hostility, or revenge." The defendant argues that the Commonwealth failed to make this showing. We do not agree that this showing was necessary.

The defendant proposes that we adopt the definition of malice required as an element of the crime of malicious destruction of property (G. L. c. 266, § 127). We decline to adopt this proposal as we have declined to adopt it in the past. See *Commonwealth* v. *Paton*, 63 Mass. App. Ct. at 219. Malicious destruction of property is a specific intent crime that requires, as an element of the offense, a showing of a cruel, hostile, or vengeful intent in addition to the intentional doing of the unlawful act. See *Commonwealth* v. *McDowell*, 62 Mass. App. Ct. 15, 22 (2004). Even with crimes not requiring a specific intent, "it seems frequently to be assumed that malice, as a jural concept, must involve intent *plus* some matter of aggravation whereas, in truth, the requirement is fully satisfied by intent *minus* any matter of exculpation or mitigation" (emphasis original). Perkins & Boyce, Criminal Law 857 (3d ed. 1982). As usually applied, "the wilful doing of an unlawful act suffices to prove malice." *Commonwealth* v. *Redmond*, 53 Mass. App. Ct. 1, 4 (2001). The concept of malice, therefore, need not include the element of

hatred, spite, grudge, or ill will. "The malice required . . . is not a feeling of ill-will toward the person threatened, but the wilful doing of the act with the illegal intent." *Commonwealth v. Buckley*, 148 Mass. 27, 28 (1888). In certain circumstances malice does not require an intent even to do the prohibited act, when, "[i]n the absence of any circumstance of exculpation or mitigation an act may be done with such heedless disregard of a harmful result, foreseen as a likely possibility, that it differs little in the scale of moral blame worthiness from an actual intent to cause such harm." Perkins & Boyce, *supra* at 858.[7] See *Commonwealth v. Pierce*, 138 Mass. 165, 179 (1884).

While the concept of malice may not require an actual intent to cause the required harm, it does require something more than simple criminal negligence.[8] "To emphasize that malice requires a greater kind of social fault than is involved in the term 'recklessness' and yet does not require an actual intent to cause the resulting harm, courts have resorted to such expressions as . . . 'a reckless indifference whether' the harm was caused or not, [or] a dangerous act . . . done with 'knowledge of such circumstances that according to common experience there is a plain and strong likelihood that' a certain type of social harm will ensue." Perkins & Boyce, *supra* at 859. See *Commonwealth v. Chance*, 174 Mass. 245, 252 (1899) (Holmes, C.J.).

---

[7] In this context, for example, Chief Justice Holmes observed that "it is possible to commit murder without any actual intent to kill or to do grievous bodily harm, and that, reduced to its lowest terms, malice in murder means knowledge of such circumstances that according to common experience there is a plain and strong likelihood that death will follow the contemplated act, coupled perhaps with an implied negation of any excuse or justification." *Commonwealth v. Chance*, 174 Mass. 245, 252 (1899). See *Commonwealth v. Grey*, 399 Mass. 469, 470 n.1 (1987) (proof of intent to kill is not required when malice aforethought can be inferred because reasonably prudent person would have known, through common experience, that "there was a plain and strong likelihood that death would follow the contemplated act"); *Commonwealth v Azar*, 435 Mass. 675, 682 (2002), *S.C.*, 444 Mass. 72 (2005) (malice can be inferred without specific intent to kill or to cause grievous bodily harm).

[8] "[I]t is now clear in this Commonwealth that at common law conduct does not become criminal until it passes the borders of negligence and gross negligence and enters into the domain of wanton or reckless conduct. There is in Massachusetts at common law no such thing as 'criminal negligence.' " *Commonwealth v. Welansky*, 316 Mass. 383, 400 (1944).

We must determine whether the Legislature intended that "malice" requires anything more than the wilful doing of the unlawful acts, without justification or mitigation, as prohibited by G. L. c. 265, § 45A(*a*). "[A] statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934). See *Sullivan* v. *Brookline*, 435 Mass. 353, 360 (2001). We must look at the words of the statute, always keeping in mind the Legislature's over-all objectives, and subjecting our analysis to the dictates of reason and common sense.

We also should not construe the statute in such a way as to negate the Legislature's clear attempt to protect victims of harassment before that behavior escalates into more dangerous conduct. Here, the Legislature was concerned with stalking behaviors. Typically, stalking behaviors involve obsessional attractions to victims and are not necessarily intended to harm or frighten them. See Kirkman, Every Breath You Take: Massachusetts Steps Up Its Efforts to Stop Stalkers, 85 Mass. L. Rev. 174, 180-183 (2001). It is unlikely that the Legislature would have expected a specific intent to alarm or harm the victim under these circumstances. See *Commonwealth* v. *Welch*, 444 Mass. at 100 (criminal harassment statute was intended to provide "a remedy to victims before 'nonthreatening' harassment escalates into life-threatening assault").[9] See also *Commonwealth* v. *Paton*, 63 Mass. App. Ct. at 219-220.

Here, the defendant's conduct has satisfied the statute's requirement of malice. His conduct was intentional and without justification or mitigation, and any reasonably prudent person would have foreseen the actual harm that resulted.

Finally, the defendant argues that the Commonwealth failed to prove that the victim was "seriously alarmed" by the defendant's

---

[9]The *Welch* court also upheld the constitutionality of G. L. c. 265, § 43A, to the extent that it is not applied to punish constitutionally protected speech. *Commonwealth* v. *Welch*, 444 Mass. at 98-99.

conduct, or to prove that a reasonable person would have suffered "substantial emotional distress" as a consequence of that conduct. The defendant argues that the tort definition of "substantial emotional distress" should be applied to cases prosecuted under G. L. c. 265, § 43A(*a*).[10] This argument, however, was considered and rejected by the *Paton* court. *Commonwealth* v. *Paton*, 63 Mass. App. Ct. at 220-221. The Supreme Judicial Court also has recommended that judges adopt a definition of "substantial emotional distress" that is in line with the common dictionary definition. "The common dictionary definition of 'substantial' is 'considerable in amount, value or worth' " and "emotional distress that is merely trifling or passing is *not* enough to satisfy this element, but must be markedly greater than that commonly experienced as part of ordinary living" (emphasis original). *Commonwealth* v. *Robinson*, 444 Mass. 102, 106, 108 (2005).

Here the victim testified that the letters caused her "concern" and then "alarm[ed]" her; later she was "very scared" and finally "terrified." The victim was sufficiently concerned and fearful to have requested on two different occasions that State officials block the defendant's telephone calls and letters. Her parents testified that they observed her to be extremely upset, very frightened, and concerned for her safety. There were at least three letters that elicited this level of severe emotional distress from the victim. Moreover, we conclude not only that was the victim seriously alarmed, in fact, by the defendant's conduct, but also that any reasonable person would be greatly alarmed and experience severe emotional distress if subjected to such similar circumstances.

*Judgment affirmed.*

---

[10]The defendant cites primarily to intentional infliction of emotional distress cases. See *Bailey* v. *Shriberg*, 31 Mass. App. Ct. 277, 279-280 (1991); *Bresnahan* v. *McAuliffe*, 47 Mass. App. Ct. 278, 282 (1999).