LEHAN, COMMONWEALTH vs., 100 Mass. App. Ct. 246

 
 COMMONWEALTH vs. JAMES LEHAN.

100 Mass. App. Ct. 246
 May 13, 2021 - September 17, 2021

Court Below: District Court, Lynn Division
Present: Meade, Englander, & Grant, JJ.

 

Stalking. Global Positioning System Device. Evidence, Chart, Business record, Hearsay, Expert opinion. Witness, Police officer. Practice, Criminal, Required finding, Hearsay.

At the trial of a criminal complaint charging, inter alia, criminal stalking in violation of G. L. c. 265, § 43 (a), evidence showing vandalism of the victim's car by the defendant, an incident in which the defendant grabbed the victim's arm, and the defendant's conduct following the arm-grabbing incident (i.e., the defendant frequently encountering the victim throughout a period of years despite the victim's changing schedule and staring at the victim while she was working out, alarming the victim enough that she obtained a firearm for her protection), taken in totality and in the light most favorable to the Commonwealth, was more than sufficient to satisfy the criminal harassment prong of the stalking conviction [251-254]; further, evidence of the vandalism (from which there could be little doubt that the act could reasonably be interpreted as a threat) was sufficient to show the additional element of a threat to sustain the stalking conviction [254].

At a criminal trial, the erroneous admission of exhibits purportedly generated from a global positioning system (GPS) bracelet worn by the defendant (including charts that showed the defendant to be located in the vicinity of the victim's home on the night her car was vandalized), in the absence of a foundation having been established by the Commonwealth under the business records exception to the rule against hearsay, pursuant to G. L. c. 233, § 78 (in that no witness testified that the GPS records met any of the required elements of the statute, no witness had personal knowledge of how the GPS records were generated or created, nor was there a witness as to how, when, and for what purpose the charts, and their annotations depicting the locations of the victim's home and purportedly the defendant's path of travel, were created), compounded by the erroneous admission of testimony by a police officer as to what the charts showed in the absence of a foundation for the officer to testify about the charts from personal knowledge, could not be said to have been harmless, where the GPS evidence was a key component of the Commonwealth's case and tied the defendant to the vandalism; accordingly, this court vacated the judgments and set the verdicts aside. [254-258]

COMPLAINTS received and sworn to in the Lynn Division of the District Court Department on September 27 and October 12, 2018.

 Page 247 

 The cases were tried before Cesar A. Archilla, J.

 Ann Grant, Committee for Public Counsel Services, for the defendant.

 Kathryn L. Janssen, Assistant District Attorney, for the Commonwealth.

 ENGLANDER, J. After a jury trial, the defendant was convicted of criminal stalking, G. L. c. 265, § 43 (a), and vandalism of property, G. L. c. 266, § 126A. The evidence at trial showed that the defendant and the victim frequented the same fitness center (gym), and that for a period of approximately three years beginning in 2015, the defendant had hounded the victim when she was at the gym, repeatedly asking her out, staring at her, and appearing at her car in the parking lot. While the defendant's actions during this period did not involve physical contact (with one exception, where he grabbed the victim's arm), his actions instilled fear in the victim, to the point where she varied her schedule at the gym, and obtained a firearm for protection. 

 In 2018 the victim's car was vandalized at her home. Over the defendant's objections, the Commonwealth introduced exhibits purportedly generated from a global positioning system (GPS) bracelet worn by the defendant, which included charts that showed the defendant to be located in the vicinity of the victim's home on the night her car was vandalized (GPS charts). [Note 1] We say purportedly, because although the investigating police officer was allowed to testify to his "conclu[sions]" from reviewing the GPS charts, no one with personal knowledge testified to how the GPS charts were generated, or to what the GPS charts actually showed. 

 On this appeal, we reject the defendant's contention that the evidence presented was insufficient to meet the elements of criminal stalking. We vacate the judgments and set aside the verdicts, however, because the admission of the GPS charts, and the officer's testimony about those charts, did not comport with the law of evidence.

 Background. 1. The trial evidence. The jury could have found the following facts from the victim's trial testimony and the testimony of the investigating officer, Officer Alex Klimarchuk. We supplement these facts from the record on appeal where necessary to discuss the evidentiary issues.

 Page 248 

 The victim first encountered the defendant in the summer of 2015 at the gym in Saugus where they both played racquetball. The defendant offered to play racquetball with the victim and to give her some pointers, and the victim testified that "[a]t first, I didn't mind when he asked if I wanted some help. But every time I was there, he was there, and he only wanted to play with me, and I didn't want to just play with him." After about two or three weeks, the defendant began to ask the victim if she "wanted to go to dinner or lunch or have coffee" with him, and he did so repeatedly. The victim declined such requests "[o]ver [twenty] times," and eventually began "avoid[ing] [the defendant] . . . because . . . I didn't want to give him the wrong impression."

 Beginning in the fall of 2015, the defendant loitered near the victim's car in the parking lot, or parked his own car near hers, so that he could speak to her when she was leaving the gym. On one occasion, he approached the victim inside the gym, "grabbed [her] arm," and requested that she come out to the parking lot so that he could ask her a question. When the victim came outside the defendant again asked whether the victim would go to dinner with him, and the victim again declined, stating that she did not mean to give the defendant the "wrong impression," and that she had a boyfriend. The victim testified that after this incident she began to feel nervous and "very unsafe"; from then on, she "decided to stay away from [the defendant] as much as [she could]."

 During the period after the arm-grabbing incident, the victim changed her gym and work schedules in an attempt to avoid the defendant, but despite her own schedule changes, the defendant would "coincidentally be there at the same time [as her] all the time," and "[a]nytime she was at the gym, [the defendant] made sure that he saw [her]." During this period the defendant never spoke to the victim, but the victim testified that on "[o]ver ten" occasions, the defendant had stared through the glass window at the victim while she participated in exercise classes. This pattern continued for roughly three years from 2015 to 2018. The victim testified that the encounters with the defendant made her fearful, and that she applied for and received a license to carry a firearm as a result.

 The pattern broke on September 21, 2018, when the victim discovered that her car had been seriously vandalized while parked outside her home. The victim reported the incident to the 

 Page 249 

Saugus police department. Officer Klimarchuk responded to the call, and testified to viewing the damage, which included two slashed tires and a lengthy mark carved into the body paint. Officer Klimarchuk also testified that the victim told him that she suspected that the defendant may have been responsible for the damage. Klimarchuk began investigating the defendant, and as a result learned that the defendant was wearing a GPS bracelet at the time of the vandalism.

 Over a series of defense objections, Officer Klimarchuk was allowed to testify regarding the GPS charts that the judge admitted under the business records exception to the hearsay rule. The GPS charts contained the legend "Position History for: James Lehan from 9/20/2018 12:00:00 AM to 9/20/2018 11:59:59 PM." The charts consisted of maps of the Saugus area, on which were shown the location of the victim's home in Saugus as well as various symbols that, inferentially, showed a path of travel, with time notations at various locations.

 No witness testified to who prepared the GPS charts, or to how they were prepared. Once the GPS charts were admitted, Officer Klimarchuk testified in substance (1) that he "investigated" the defendant's "location" on the day before the car was vandalized, (2) that in "response" to his "inquiry," he received the previously admitted GPS charts, and (3) that after reviewing the GPS charts, and based upon his "experience as an officer and the information and investigation that [he] did," Officer Klimarchuk "came to the conclusion" that on the date of the vandalism, the defendant had left the gym at 3:45 that afternoon and gone directly to "the area of [the victim's home]," where he remained "for a few minutes," after which the defendant left the area, but returned later that night around 10:51 P.M. As the victim did not have personal knowledge that the defendant had vandalized her car, the GPS records establishing the defendant's location were the key evidence linking the defendant to the vandalism.

 2. The motion in limine regarding the GPS records and charts. As noted, the defense objected to most of Officer Klimarchuk's testimony, and both Klimarchuk's testimony and the GPS records were the subject of a motion in limine and an extensive pretrial hearing. At the hearing the prosecutor stated that two of the charts had been provided to Officer Klimarchuk by the electronic monitoring program of the probation department (ELMO), which is responsible for maintaining GPS data from the GPS bracelets. 

 Page 250 

 She also stated that there would be no trial witness from ELMO or from the probation department, but that some of the records had been certified as "business records" under G. L. c. 233, § 79J, and that the GPS records (including the charts) should accordingly be admitted. The prosecutor also contended that Officer Klimarchuk should be allowed to testify (1) that he had "received" the GPS charts during his investigation, and (2) as to his conclusions from his review of the charts. 

 Defense counsel argued many grounds for excluding both the GPS records and Officer Klimarchuk's testimony, which for present purposes can be summarized as follows: (1) authentication -- the GPS records could not be authenticated without a witness; (2) hearsay -- the GPS records could not be established as business records without a witness with personal knowledge as to how the charts (and the data underlying them) were created and maintained at ELMO; (3) foundation -- there was no witness with personal knowledge sufficient to testify about what the GPS charts showed, and specifically, that Officer Klimarchuk did not have such personal knowledge and instead was merely passing along hearsay that he received from a contact at ELMO; and (4) confrontation clause -- the GPS charts were "testimonial" hearsay evidence, because ELMO had created them in response to Officer Klimarchuk's request and their admission therefore violated the Sixth Amendment to the United States Constitution. [Note 2]

 The judge ultimately ruled that the certified records could be admitted as business records, including the GPS charts. [Note 3] He also allowed Officer Klimarchuk to testify regarding the charts he had received as part of his investigation, including Klimarchuk's conclusion that the GPS charts showed the defendant's location on the dates and times shown on the charts. The underlying basis for the judge's conclusion was that the GPS records had been certified in an affidavit from ELMO's keeper of the records, pursuant to G. L. c. 233, § 79J.

 Page 251 

 The jury returned verdicts of guilty on the stalking and vandalism charges. [Note 4] The defendant appeals.

 Discussion. 1. Sufficiency of the evidence. The defendant first challenges the sufficiency of the evidence of criminal stalking. We evaluate such a challenge under the familiar Latimore standard, which requires that we determine "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (citation omitted). Commonwealth v. Latimore, 378 Mass. 671, 677 (1979). [Note 5] "A conviction may rest exclusively on circumstantial evidence, and, in evaluating that evidence, we draw all reasonable inferences in favor of the Commonwealth." Commonwealth v. Rakes, 478 Mass. 22, 32 (2017). "An inference drawn from circumstantial evidence 'need only be reasonable and possible; it need not be necessary or inescapable.'" Commonwealth v. Bush, 427 Mass. 26, 30 (1998), quoting Commonwealth v. Beckett, 373 Mass. 329, 341 (1977).

 To sustain a conviction of criminal stalking, the Commonwealth must prove that a defendant:

"(1) willfully and maliciously engage[d] in a knowing pattern of conduct or series of acts over a period of time directed at a specific person which seriously alarm[ed] or annoy[ed] that person and would cause a reasonable person to suffer substantial emotional distress, and (2) ma[de] a threat with the intent to place the person in imminent fear of death or bodily injury . . . ."

G. L. c. 265, § 43 (a). The first element of criminal stalking comprises the lesser included offense of criminal harassment, see Commonwealth v. McDonald, 462 Mass. 236, 241 (2012), which further breaks down into five elements:

"(1) the defendant engaged in a knowing pattern of conduct or speech, or series of acts, on at least three separate occasions;

 Page 252 

 (2) the defendant intended to target the victim with the harassing conduct or speech, or series of acts, on each occasion; (3) the conduct or speech, or series of acts, were of such a nature that they seriously alarmed the victim; (4) the conduct or speech, or series of acts, were of such a nature that they would cause a reasonable person to suffer substantial emotional distress; and (5) the defendant committed the conduct or speech, or series of acts, 'willfully and maliciously.'"

Commonwealth v. Kulesa, 455 Mass. 447, 452 (2009), quoting G. L. c. 265, § 43A (a).

 The defendant contends that the evidence was insufficient to show either criminal harassment or criminal stalking. The defendant's principal contention is that what the Commonwealth proved was largely innocuous behavior, and indeed, that it was protected speech. The defendant points out, correctly, that asking someone out, or staring at them, even repeatedly, is not sufficient to satisfy a "pattern" of "willful and malicious" conduct. See McDonald, 462 Mass at 243-244. He thus argues that the Commonwealth failed to prove three qualifying willful and malicious acts. 

 We disagree, because here we are satisfied that the Commonwealth showed considerably more than behavior that was protected speech or conduct. In brief, the evidence showed that the defendant's pattern of conduct comprised (1) an initial phase of repeated advances, all of which were declined; (2) the arm-grabbing incident; (3) a second phase spanning several years, during which the defendant spoke no words to the victim but "stared" at her and encountered her with a frequency that the victim found alarming, particularly in light of the victim's efforts to avoid such encounters; and (4) the vandalism of the victim's car. This evidence, taken in totality and in the light most favorable to the Commonwealth, was more than sufficient to satisfy the criminal harassment prong of the stalking conviction.

 The statutes require at least three acts ("a pattern"), and that the pattern be "willful and malicious." G. L. c. 265, §§ 43 (a), 43A. "'Conduct is wilful when the actor intends both the conduct and its harmful consequences [and] may be wilful and malicious although its harmful consequences are neither substantial nor highly likely' (citations omitted)." McDonald, 462 Mass. at 242, quoting Commonwealth v. Schuchardt, 408 Mass. 347, 352 

 Page 253 

(1990). Moreover, in this context, "[t]he concept of malice . . . need not include the element of hatred, spite, grudge, or ill will," but rather only requires that the acts were "intentional and without justification or mitigation." Commonwealth v. O'Neil, 67 Mass. App. Ct. 284, 291-293 (2006). In addition, as the cases explain, malice can be inferred even in instances of largely innocuous conduct, if the entire course of conduct "len[ds] [those acts] a more sinister air." McDonald, supra at 243. For example, in Commonwealth v. Paton, 63 Mass. App. Ct. 215, 219 (2005), this court concluded that arguably innocuous conduct -- frequently visiting a bar at which the victim worked and staring at the victim without speaking -- had been imbued with "an ominous, menacing, [and] even sinister quality" in the context of the defendant's full course of conduct.

 Here we are satisfied that the Commonwealth sufficiently proved at least three separate "willful and malicious" acts. Two acts stand out from the general pattern -- the vandalism and the arm-grabbing incident -- and each of these qualified as a "willful and malicious" act. The vandalism was conduct, not speech, plainly intended to cause (and capable of causing) reasonable fear. We think similarly of the arm-grabbing incident, which, although the defendant was acquitted of the charged assault and battery, nevertheless represented an escalation to physical contact that was unwelcome, particularly as the victim had already repeatedly declined the defendant's invitations. And for a third act we need look no further than the defendant's conduct following the arm-grabbing incident, where throughout a period of years the defendant managed to encounter the victim frequently despite the victim's changing schedule, and where he would often stare at her while she was working out -- alarming the victim enough that she obtained a firearm for her protection. See Paton, 63 Mass. App. Ct. at 219-220 (malicious conduct where defendant, who had spoken to victim once, thereafter stared at victim without speaking on several occasions and also appeared unexpectedly in proximity to victim). The jury could have reasonably inferred that the defendant's continued course of conduct demonstrated a "malevolent attitude," McDonald, 462 Mass. at 244, if not a "retaliatory and revengeful purpose[]," Paton, supra at 220, due to her repeated rejections of his advances. See O'Neil, 67 Mass. App. Ct. at 293.

 The defendant next argues that there was insufficient evidence that his conduct targeted the victim, and that it was mere happenstance

 Page 254 

 that he encountered the victim frequently at the gym. However, a jury certainly could have found otherwise. The victim's testimony established the defendant's notable interest in her, and the jury could have inferred that the defendant's presence at the gym when the victim was there, despite her varied schedule, was not a coincidence. Indeed, the pattern of conduct shown was plainly targeted at the victim. Cf. McDonald, 462 Mass. at 243 (evidence must permit inference that "defendant's attention or interest was particularly focused on the complainant"). Moreover, the defendant's course of conduct would "greatly alarm[] and [cause] severe emotional distress" to a reasonable person, and did in fact have this effect on the victim. See O'Neil, 67 Mass. App. Ct. at 294.

 Turning to the stalking conviction, we also conclude that the evidence was sufficient to show the additional element of a threat, requiring an "inten[t] to place the victim in immediate fear that physical harm is likely to occur and the victim's fear must be reasonable." Commonwealth v. Walters, 472 Mass. 680, 693 (2015). The threat need not be a direct communication, but rather may be indirect or communicated through otherwise ambiguous behavior, as long as surrounding circumstantial evidence would allow a jury to infer that the defendant's behavior was intended as a threat to the victim. See id. at 692-693.

 Here, although the vandalism was not a direct verbal statement, there can be little doubt that it nonetheless could be reasonably interpreted as a threat. The act itself was violent and criminal, and directed at the victim's property. The victim testified that she believed that the defendant had committed the vandalism "based on what had been going on," and the victim was in fact "afraid" and "scared" following the discovery of the vandalism. See Commonwealth v. Gupta, 84 Mass. App. Ct. 682, 686-687 (2014).

 2. The GPS evidence. We next consider whether the GPS records, and Officer Klimarchuk's testimony regarding same, were properly admitted. "As the defendant objected to the admission of [the GPS records] at trial, we review for prejudicial error . . . . We must first determine whether the judge committed an error of law or an abuse of discretion. . . . If we find such an error, we then ask whether it was prejudicial." Commonwealth v. Tavares, 482 Mass. 694, 712 (2019). We conclude that in this case the Commonwealth failed to provide the foundation necessary for the GPS records to be admitted, and that Officer 

 Page 255 

Klimarchuk's testimony about those charts likewise should not have been admitted.

 We need not visit all of the defendant's many arguments on the evidentiary issues to explain our conclusion. Starting with the GPS records, including the GPS charts, the evidence presented was not sufficient to establish them as business records. Business records can be admitted, as an exception to the rule against hearsay, pursuant to G. L. c. 233, § 78:

"A[] . . . record, . . . made as a memorandum or record of any act, transaction, occurrence or event, shall not be inadmissible in any civil or criminal proceeding as evidence of the facts therein stated . . . because it is hearsay . . . if the court finds that the entry, writing or record was made in good faith in the regular course of business and before the beginning of the civil or criminal proceeding aforesaid and that it was the regular course of such business to make such memorandum or record . . . ."

 As noted, in this case no witness testified that the GPS records met any of the required elements of G. L. c. 233, § 78. There was no witness who had personal knowledge of how the GPS records were "made" -- that is, generated or created. Nor was there a witness as to how, when, and for what purpose the charts, and their annotations depicting the locations of the victim's home and (purportedly) the defendant's path of travel, were created. Unless stipulated by opposing counsel, that foundation must be laid under § 78 before the judge can make the necessary finding that the records were "made in good faith in the regular course of business and before the beginning of the . . . criminal proceeding." Id. See Commonwealth v. Andre, 484 Mass. 403, 409-412 (2020). [Note 6] Ordinarily, laying that foundation is done through a knowledgeable keeper of the records of the business that made the record. See id. See also Mass. G. Evid. § 803(6)(A) (2021). 

 Page 256 

 Since there was no evidentiary basis to find that the GPS records were business records, they were hearsay and could not be admitted. See Wingate v. Emery Air Freight Corp., 385 Mass. 402, 406-407 (1982); Commonwealth v. Hussey, 14 Mass. App. Ct. 1015, 1016 (1982); Mass. G. Evid. § 901 (2021). [Note 7] Contrast Davis, 487 Mass. 448, 459-460 (2021) (manufacturer's product development manager testified about how GPS device worked); Andre, supra at 409.

 The Commonwealth argues that the GPS records could be admitted simply because they were accompanied by a certificate of a keeper of the records, citing G. L. c. 233, § 79J, but the Commonwealth is wrong. Section 79J provides:

"A record kept by any business which is required to be produced in court by any party shall be certified by the affidavit of the person in custody thereof to be a true and complete record and shall be delivered by such business to the clerk of such court . . . . Such record, so certified and delivered shall be deemed to be sufficiently identified to be admissible in evidence if admissible in all other respects" (emphasis added).

 As is evident from the statute's language, the certification under G. L. c. 233, § 79J, overcomes an authenticity objection; it allows the documents to be admitted in court as true and complete records of a business, "if admissible in all other respects." The statute does not overcome a hearsay objection, however; it does not automatically qualify the records as business records under G. L. c. 233, § 78. Rather, § 78 sets forth its own requirements to overcome a hearsay objection, and the proponent still must show the elements of that statute by competent evidence. And in that

 Page 257 

 regard, the affidavit under § 79J cannot suffice to establish that the records are business records even if, as here, the affidavit recites the required elements. The affidavit for such purposes is classic hearsay; it is an out-of-court statement being offered for its truth. See Mass. G. Evid. 801(c) (2021).

 At the hearing on the motion in limine, the judge commented that hospital records and bank records are often admitted without a testifying witness, and suggested that the GPS records fell into the same category. Hospital records, however, are subject to their own separate statute that provides that such records are directly admissible for certain purposes. See, e.g., G. L. c. 233, § 79 ("Records kept by hospitals . . . may be admitted by the court . . . as evidence in the courts of the Commonwealth so far as such records relate to the treatment and medical history of such cases"); Bouchie v. Murray, 376 Mass. 524, 528 (1978) ("the purpose of the statute [is] to admit presumptively reliable evidence without the necessity of calling numerous hospital personnel as witnesses"). And bank records are also subject to their own peculiar statutes governing admissibility. See G. L. c. 233, §§ 77, 77A; Commonwealth v. Perez, 89 Mass. App. Ct. 51, 59-60 (2016). No such separate statute applies to the GPS records at issue.

 In short, the GPS records, including the GPS charts, should not have been admitted based on the showing made at trial. So too, Officer Klimarchuk's testimony regarding the GPS charts should not have been admitted. As neither the charts nor the data underlying them were properly in evidence, allowing Officer Klimarchuk to describe what the charts showed compounded the error. Passing that point, the prosecution also failed to establish a foundation for Officer Klimarchuk to testify about the charts from personal knowledge. Officer Klimarchuk did not create the GPS charts nor did he know how they were created. He was not testifying as an expert, and in any event he had almost no personal experience in reviewing such charts. The fact that he "received" the GPS charts during his investigation was plainly not evidence as to what the charts showed, and he should not have been allowed to offer the critical testimony, based on the GPS charts, that "[he] came to the conclusion that [the defendant] left from [the gym] in Saugus at approximately 3:45 in the afternoon on the 20th. [The defendant] went directly to the area of [the victim's residence] . . . . [and] [l]ater returned that night at around 10:51 P.M."

 Page 258 

 Finally, the admission of the GPS charts, and Officer Klimarchuk's testimony regarding them, was prejudicial under the circumstances. The vandalism evidence was a key component of the Commonwealth's case, as it was the best evidence that the defendant had made a threat. The GPS evidence is what tied the defendant to the vandalism. Under the circumstances, the introduction of the GPS evidence was not harmless, and the judgments on the charges of stalking and vandalism must be vacated and those verdicts set aside. [Note 8] See Davis, 487 Mass. at 460-461. [Note 9]

 So ordered.

FOOTNOTES
[Note 1] We refer to the charts referenced in the officer's testimony as the "GPS charts." We refer to the GPS charts and the underlying data, which was also admitted, collectively as the "GPS records." 

[Note 2] Defense counsel adverted to a fifth argument -- that the GPS records had not been shown to be scientifically reliable -- but this argument was waived at the motion in limine hearing. 

[Note 3] Three charts were admitted in evidence as exhibits 1, 2, and 4. Exhibit 4 was part of the certified records returned in response to the Commonwealth's subpoena. Exhibits 1 and 2 were not certified; at the motion in limine hearing the prosecutor represented that they had been sent to Klimarchuk by the probation department, by e-mail. 

[Note 4] The jury also returned a verdict of not guilty on a charge of assault and battery, which had been predicated on the arm-grabbing incident. 

[Note 5] For sufficiency purposes we do not consider the defendant's evidentiary arguments, as the sufficiency of the evidence "is to be measured upon that which was admitted in evidence without regard to the propriety of the admission." Commonwealth v. Sepheus, 468 Mass. 160, 164 (2014), quoting Commonwealth v. Farnsworth, 76 Mass. App. Ct. 87, 98 (2010). 

[Note 6] Section 78 also states that "[t]he court, in its discretion . . . may . . . require the party offering the [record] . . . to call as his witness any person who made the entry, . . . or who has personal knowledge of the facts stated in the entry . . ." (emphasis added). That language does not provide the judge with discretion to admit a record where the basic requirements of § 78 have not been met by admissible evidence (or stipulation); rather, it allows judges to require, as an additional prelude to admission, that the proponent call a witness with personal knowledge of the facts underlying the record in question, as opposed to a witness that is merely familiar with the record-keeping system. 

[Note 7] We of course are not saying that the GPS records are generally inadmissible, or not business records. Similar GPS records, including charts, are frequently admitted in our courts. See Commonwealth v. Davis, 487 Mass. 448, 456 (2021); Commonwealth v. Thissell, 457 Mass. 191, 197-199 (2010). We hold simply that here the necessary foundation was lacking for the judge to find that the GPS records met the statutory requirements. 

 Although not expressly argued by the Commonwealth, it is possible the GPS charts could be computer generated and thus not hearsay documents. See Commonwealth v. Brea, 488 Mass. 150, 162-163 (2021); Davis, 487 Mass. at 464-465. To admit the charts as computer-generated, however, the Commonwealth first would have needed to lay the proper foundation, which was not done here. Brea, supra at 163 ("Yet the Commonwealth did not indicate how the information was generated").

[Note 8] The prosecution also presented the testimony of another witness, Detective Forni. The defense challenges much of Detective Forni's testimony as improper vouching, or expert testimony. We do not rely on Detective Forni's testimony in deciding any of the issues in this case. We note, however, to the extent relevant to any retrial, that certain aspects of Detective Forni's testimony are indeed troubling -- for example, on redirect examination the prosecutor asked Detective Forni, "After that interview [with the victim] . . . did you have any doubt about whether or not [the victim] was grabbed by the individual she described?" She answered, "I did not." This was impermissible vouching for the witness's credibility. See Commonwealth v. Quinn, 469 Mass. 641, 646 (2014). 

[Note 9] In light of our resolution of this case, we need not address the defendant's other claims of error. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.