# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 07-2315

JEVON JACKSON,

*Plaintiff-Appellant,*

*v.*

MATTHEW J. FRANK, Secretary, and
WILLIAM POLLARD, Warden,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 07 C 28—**John C. Shabaz,** *Judge.*

SUBMITTED NOVEMBER 7, 2007[1]—DECIDED DECEMBER 5, 2007

Before KANNE, EVANS, and WILLIAMS, *Circuit Judges.*

EVANS, *Circuit Judge.* Jennifer Aniston: television ("Friends") star; actress in several forgettable ("Rumor Has It" and "Along Came Polly") recent films; former wife of Brad Pitt; and anointed as a hottie by "FHM Magazine"—#35 on its list of the "100 Sexiest Women in the World in 2007" (she also made "People" magazine's "50

---

[1] After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus the appeal is submitted on the briefs and the record. *See* Fed. R. App. P. 34(a)(2).

Most Beautiful People" list in 2002)—has legions of fans. Jevon Jackson, the plaintiff in this case, is one of them. And Jackson would like to display a photograph of Aniston in his room. His "room," however, is actually a prison cell where Jackson is serving time for a state court conviction in Wisconsin. The prison authorities, relying on a rule, won't allow Jackson to receive, and thus display, a commercially published photograph of Aniston that he had ordered So Jackson made a federal case out of the situation by filing this suit alleging that Wisconsin was violating his rights under the First Amendment. The district court granted the state's motion for summary judgment and Jackson appeals.

Jackson's suit, under 42 U.S.C. § 1983, named Matthew Frank, the Secretary of the Wisconsin Department of Corrections (DOC), and William Pollard, the warden at Wisconsin's Green Bay Correctional Institute (GBCI), as defendants. The GBCI is where Jackson was serving his state sentence. The facts are not in dispute.

In September 2006, the DOC adopted a policy that prevents inmates from possessing individual, commercially published photographs. *See* DAI Policy No. 309.20.01. Commercially published photographs subject to the policy include photos of "celebrity figures, movie stars, models, or other [*sic*] that are produced for sale or distribution." Inmates, however, may receive photographs of family and friends, as well as commercially produced photographs published in magazines, subject to content and quantity restrictions that are not at issue here. After the policy was put in place, Jackson, who at the time had successfully ordered photographs of other celebrities, was told that DOC officials would not deliver his photograph of Aniston because it violated the new policy. The photograph that Jackson requested is not part of the record on appeal, but neither party suggests that it

contained any inappropriate content.[2] Jackson filed a complaint with the Institute Complaint Examiner at GBCI, arguing that the rule was arbitrary and that it violated his First Amendment rights. The complaint was dismissed. Jackson then moved his complaint to federal court.

After discovery closed, the defendants moved for summary judgment. They claimed that the increasing volume of incoming mail—GBCI may receive as many as 1,500 pieces of mail a day—and the difficulty processing it necessitated the ban on commercially published photographs. Daniel Westfield, the security chief for the DOC, explained without contradiction that individual, commercially published photographs had become a particular burden on the prison system because they often contained nudity and other forbidden content like gang symbols. According to Westfield, these photographs are problematic because staff members have to take time to review each of them and, if they disallow the photographs because of content, contact the inmates to determine how to dispose of them. On the other hand, the policy permits photographs of family and friends because, he asserted, they are less likely to contain gang symbols, nudity, and other impermissible material. Additionally, Westfield declared that inmates can subscribe to magazines to find individual celebrity photographs. He explained that magazines were less burdensome to process than individual, commercially published photographs because staff members can more easily predict their content.

---

[2] That's good. In 2000, Aniston sued "Celebrity Skin" magazine for publishing photos taken of her while sunbathing topless in her own backyard!

In his response, Jackson disputed the necessity of the ban, asserting that the prison did not rationally advance its interest in preserving resources by disallowing commercially published photographs, while permitting inmates to subscribe to magazines that may contain hundreds of photographs. Jackson also argued that he had no alternative means of possessing a similar photograph because he could not predict when a magazine would contain photos of Aniston. Additionally, Jackson asserted that requiring him to order several magazines to find her picture would actually increase the burden on prison resources. Therefore, he argued, the policy was an exaggerated response to unrealistic prison concerns. The district court, in granting summary judgment, embraced the defendants' arguments and rejected the claims asserted by Jackson.

We review the district court's grant of summary judgment *de novo. See Winters v. Fru-Con Inc.*, 498 F.3d 734, 743 (7th Cir. 2007). On appeal Jackson argues that the DOC's policy violates his First Amendment right to receive information through the mail. The Supreme Court has held that "imprisonment does not automatically deprive a prisoner of certain important constitutional protections, including those of the First Amendment." *Beard v. Banks*, 126 S. Ct. 2572, 2577 (2006) (citing *Turner v. Safley*, 482 U.S. 78, 93 (1987)). A prison regulation that restricts an inmate's First Amendment rights is permissible if it is "reasonably related to legitimate penological objectives." *Turner*, 482 U.S. at 89. Among the factors relevant in determining the constitutionality of this type of prison regulation are: (1) whether there is a valid, rational connection between the regulation and the legitimate government interest put forward to justify it; (2) whether alternative means to exercise the right exist; (3) the impact that accommodating the right will have on prison resources; and (4) the absence of alternatives

to the prison regulation. *Id.* at 89-90. The Supreme Court also has cautioned that courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). When challenging the reasonableness of the prison's regulation, the inmate bears the burden of persuasion. *See id.*

With regard to the first factor, we conclude that the defendants' economic interest in saving staff resources is legitimate. *See Lindell v. Frank*, 377 F.3d 655, 659 (7th Cir. 2004). Jackson, as we said, argues that the policy does not rationally advance this interest because it allows inmates to subscribe to multiple magazines in lieu of individual, commercial photographs. But given the uncontested evidence that the prison can more easily, and at less cost, process magazines than it can stand-alone commercial photographs, a rational connection exists between the policy and preserving resources. For similar reasons, we also find that Jackson has an alternative means of exercising his right,[3] namely, through subscribing to a magazine. While that might not guarantee an image of Aniston in every issue, the likelihood of an eventual photograph of her is sufficiently high to suffice as an alternative. *See generally Tarpley v. Allen County, Indiana*, 312 F.3d 895, 899 (7th Cir. 2002) (noting that prisons are only obligated to "make reasonable efforts" to accommodate First Amendment rights. Note, however, that *Tarpley* involved something much more important than a photograph of Jennifer Aniston—it involved religious issues as the inmate there wanted his own Bible.) The

---

[3] If possessing a photo of a movie star in a prison cell can even be deemed a "right" protected by the First Amendment.

third factor, the impact of accommodating the right on prison resources, also cuts in the defendants' favor. The defendants receive up to 1,500 pieces of mail per day and, they assert, the ban on individual, commercially published photographs is necessary to preserve staff resources. We agree.

The last factor, the absence of alternatives to the prison regulation, also breaks toward the defendants. We previously have suggested that the prison could reduce its volume of mail by limiting the number of materials that an inmate is allowed to receive, rather than implementing an outright ban on particular content. *See Lindell*, 377 F.3d at 660. But a regulation does not need to satisfy a "least restrictive alternative test." *Turner*, 482 U.S. at 90-91; *Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991). Here, Jackson has put forward no evidence of the supposed cost savings of capping the volume of mail that inmates may receive compared to the benefits of banning individual, commercial photographs. Finally, the defendants' decision to eliminate only one segment of mail is consistent with their stated goal of saving staff resources. In light of the deference that prison administrators enjoy, we conclude that Jackson has failed to show a genuine issue of material fact on this issue as well.

The judgment of the district court is AFFIRMED.

A true Copy:

       Teste:

              _____
              *Clerk of the United States Court of*
              *Appeals for the Seventh Circuit*