# In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 09-4112 & 10-1408

FRANK VAN DEN BOSCH,

*Plaintiff-Appellant,*

*v.*

RICK RAEMISCH, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 3:09-cv-00062-bbc—**Barbara B. Crabb**, *Judge.*

DENNIS E. JONES-EL,

*Plaintiff-Appellant,*

*v.*

WILLIAM POLLARD, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 1:07-cv-00504—**William C. Griesbach**, *Judge.*

ARGUED DECEMBER 1, 2010—DECIDED SEPTEMBER 15, 2011

Before BAUER and POSNER, *Circuit Judges,* and PALLMEYER, *District Judge.**

PALLMEYER, *District Judge.* These consolidated appeals present constitutional challenges to regulations imposed by the Wisconsin Department of Corrections ("DOC") on incoming prisoner mail. Frank Van den Bosch is the publisher of *The New Abolitionist*, a newsletter about the Wisconsin state prison system. After reviewing the March 2007 edition of the newsletter, Wisconsin prison officials concluded that its content posed an unacceptable risk to inmate rehabilitation and prison security, and therefore refused to distribute the issue to DOC inmates. Van den Bosch challenged this decision in a lawsuit against various prison officials pursuant to 42 U.S.C. § 1983. He alleged that the DOC's ban on the March 2007 edition of the newsletter violated his First Amendment rights and his Fourteenth Amendment right to due process. The district concluded that the defendants were entitled to qualified immunity and entered summary judgment in their favor on that basis.

The second appellant, Dennis E. Jones-El, is a Wisconsin state prisoner. Jones-El filed a First Amendment claim against various DOC employees after they confiscated medical records and legal documents regarding other inmates, as well as copies of an article he published in the May 2006 edition of *The New Abolitionist*. According to Jones-El, the prison officials wrongly interfered with his

---

* The Honorable Rebecca R. Pallmeyer, United States District Court for the Northern District of Illinois, sitting by designation.

incoming mail in violation of the First Amendment. The prison officials moved for summary judgment, and the district court dismissed Jones-El's claims on their merits. For the following reasons, we affirm the judgments of the district courts in both actions.

**I.**

**A. Van den Bosch**

Frank Van den Bosch is a community organizer and publisher of the now-defunct *The New Abolitionist*, a newsletter affiliated with the Prisoners' Action Coalition, a not-for-profit organization in Wisconsin.[1] The newsletter generally advocates for prison reform, but often featured critical commentary about certain policies of the DOC. Any publication sent to an inmate at the DOC undergoes an individual review process by defendant Dan Westfield, Security Chief of the DOC's Division of Adult Institutions. Under the Wisconsin Administrative Code, the DOC may not deliver incoming or outgoing mail if it is "'injurious,' meaning material that: [p]oses a threat to the security, orderly operation, discipline or safety of the institution," or "[i]s inconsistent with or poses a threat to the safety, treatment or rehabilitative goals of an inmate." Wis. Admin. Code § DOC 309.04(4)(c)(8).

---

[1] While this case was pending before this court, Van den Bosch changed the newsletter's name to *Wisconsin Prison Watch*.

The March 2007 edition of *The New Abolitionist* contained eleven articles on a variety of issues related to Wisconsin prisons. Defendant Westfield concluded that four of those articles were objectionable under the Code. The first article, written by Van den Bosch, contained a brief discussion of a class-action settlement agreement involving the Wisconsin Secure Program Facility ("WSPF") and remarked:

> We have had word that the DOC is looking for volunteers to fill the Charlie unit cells at [the WSPF]. No school, no work, no cafeteria, less canteen, no contact visits, no storage for property, tiny cells, and the close proximity of the revolving door to the dungeons, all sound enticing, don't they? I'm sure guys will be lining up for a vacation in SW Wisconsin, even further away from their families. Don't fall into the trap!

In defendant Westfield's view, Van den Bosch's article was harmful because it contained inaccurate information about the availability of inmate jobs at WSPF, and could also limit the DOC's ability to maximize its programming resources if it effectively discouraged inmates from transferring to WSPF.

The other three articles that drew defendant Westfield's attention were written by prison inmates. One criticized the Wisconsin Parole Commission and Program Review Committee ("PRC") for making "totalitarian decisions," described the PRC as "abusers of prisoner[s] and prisoners' families," and suggested that certain programs were being denied "to prisoners for no

legitimate reason at all." Another article presented the inmate writer's concerns about the PRC's parole decisions and stated that the purpose of his article was to "show the deceiving [and] manipulative tactics" and "fabricated stories" that PRC used to keep individuals incarcerated indefinitely. Finally, the fourth article updated its readers on recent prisoner litigation in the Seventh Circuit, suggested that prisoners erroneously rely upon courts to seek social change, and urged readers to "employ any and all means necessary," including mass protests in front of prisons, in order to "bring some attention to this madness they call prison life."

Defendant Westfield concluded not only that these articles included false information, but that the authors' inflammatory statements could potentially encourage "distrust of staff, paranoia, and hopelessness among inmates seeking release on discretionary parole . . . as well as discouraging rehabilitation efforts by inmates, who are wrongly under the impression that DOC is making allegedly illegal efforts to keep them confined as long as possible." As a result, defendant Westfield banned the entire March 2007 newsletter on April 11, 2007, and sent an e-mail notice to all DOC Security Directors throughout the state ordering the officials to enforce the ban by notifying their respective mailrooms that inmates should not receive the newsletter.[2] Prisoners who subscribed to the newsletter received a notice

---

[2] Though the March 2007 newsletter was banned across Wisconsin prisons, the record indicates that the newsletter was inadvertently distributed to several prisoners.

from defendant Westfield explaining that the newsletter would not be delivered because it "pose[d] a threat to the [s]ecurity, orderly operation, discipline or safety of the institution."

In April 2007, Van den Bosch received similar "non-delivery" notices from the DOC stating that the March 2007 edition of the newsletter was banned because prison officials considered it a security threat under Wis. Admin. Code § DOC 309.04(4)(c)(8). In response, Van den Bosch filed suit against Westfield and various other prison officials under 42 U.S.C. § 1983 in the Western District of Wisconsin in February 2009. He alleged that defendants violated his First Amendment rights by refusing to distribute the newsletter to inmates, and his Fourteenth Amendment right to due process by failing to give him proper notice of that decision. The parties filed cross-motions for summary judgment and the district court granted defendants' motion. The court found defendants were entitled to qualified immunity on the First Amendment claim because Van den Bosch failed to meet his burden of showing it was "clearly established" in 2007 that prohibiting distribution of his newsletter in prison violated the First Amendment. The court, therefore, did not reach the question of whether defendants' conduct violated Van den Bosch's constitutional rights.

On appeal, Van den Bosch does not challenge the district court's ruling regarding his due process claim, but contends that Judge Crabb's prior ruling in *Johnson v. Raemisch*, 557 F. Supp. 2d 964 (W.D. Wis. 2008)

precludes the qualified immunity defense to his First Amendment challenge. In *Johnson*, a Wisconsin prisoner and subscriber to *The New Abolitionist* sued three DOC officials for refusing to deliver his March 2007 issue of the newsletter. As in this case, defendants submitted an affidavit from Westfield asserting that the articles in the newsletter contained false information about the conditions of the Wisconsin Secure Program Facility, encouraged distrust of prison staff, and were likely to foster "'hopelessness'" among inmates. *Id.* at 965. The district court was not persuaded. Judge Crabb concluded that the content of the newsletter was not threatening and that the DOC's justifications for censoring the newsletter amounted to nothing more than "'because we said so.'" *Id.* The district court concluded that defendants failed to show that their decision to ban the newsletter was reasonably connected to a legitimate penological interest under *Turner v. Safley*, 482 U.S. 78, 107 S. Ct. 2254 (1987), and ordered the DOC to deliver a copy of the newsletter to Johnson immediately.[3] *Johnson*, 557 F. Supp. 2d at 965, 975. Plaintiff Van den Bosch now relies upon *Johnson* to argue that the DOC's

---

[3] As of May 2008, the DOC began to allow prisoners to possess the March 2007 issue. In her decision in *Johnson*, Judge Crabb observed that "multiple Wisconsin prisoners received the newsletter [at issue] without apparent consequence," and concluded that defendants were required to show that their decision satisfied the *Turner* factors, but had not done so. 557 F. Supp. 2d at 975. *Johnson* was not appealed, and we express no opinion about the merits of the decision.

censorship of the March 2007 issue violated a clearly established right of which the prison officials should have known.

## B. Jones-El

Dennis E. Jones-El, also known as Mustafa-El K.A. Ajala, was formerly confined at the Green Bay Correctional Institution ("GBCI").[4] He has been an active litigant in prisoners' rights cases, *see Jones-El v. Berge*, 374 F.3d 541 (7th Cir. 2004), and has previously written various articles on prison conditions. In April 2006, following the suicide of John Virgin, a fellow inmate and friend, Jones-El wrote an article for the May 2006 edition of *The New Abolitionist* entitled, "Who Says Wisconsin Doesn't Have the Death Penalty?" In the article, Jones-El detailed the conditions of confinement at GBCI and suggested that the DOC places Wisconsin inmates in segregation for longer periods of time than inmates in other states and for minor infractions. Jones-El characterized segregation as "psychological death row" because, he asserted, a strong correlation exists between the growing number of Wisconsin prisoners housed in segregation units and the high incidence of suicide among inmates. At the conclusion of the article, Jones-El asked: "Can anybody out there hear me? [Wisconsin] definitely has a death

---

[4] Jones-El is currently housed at the Wisconsin Secure Program Facility ("WSPF"). All of the events surrounding his complaint occurred while he was incarcerated at GBCI between May 10, 2005, and February 9, 2007.

penalty, because they are literally killing us in here!" At some point soon thereafter, the DOC banned the May 2006 issue of the newsletter on the ground that it is "injurious" under the Wisconsin Administrative Code. Jones-El claims he was aware of the ban within the prison, but nevertheless sought to have his article published in other news media outlets. He claims that he therefore sent his original copy of the article to Diane Block, a friend outside of prison, and asked her to send back copies of his article to submit for publication. (We are left to wonder why Jones-El asked that Ms. Block return copies to him rather than simply asking her to submit his article for publication directly.) Unsurprisingly, when Block attempted to send Jones-El his original version of the article and other copies, prison officials rejected the mail for delivery.

As previously noted, the DOC has promulgated several regulations regarding the circumstances under which a prison may refuse to deliver mail to an inmate. In addition to the provisions described above, regulations authorize the DOC to refuse to deliver mail to an inmate if it "[i]s determined by the warden . . . to be inappropriate for distribution throughout the institution." Wis. Admin. Code § DOC 309.04(4)(c)(12). When a piece of incoming mail is rejected, a written notice is sent to the sender and the inmate to whom the mail was addressed, explaining why the letter was not delivered; an inmate may then ultimately appeal the decision to the warden. Wis. Admin. Code § DOC 309.04(4)(e)-(f). Block attempted to send Jones-El multiple copies of his article on four separate dates in 2006, and on each occasion,

Kevin Postl, a GBCI Correctional Sergeant, rejected the mail and sent Jones-El a "Notice of Non-Delivery of Mail." According to defendant Westfield's affidavit, many statements in Jones-El's article "are problematic in a prison environment because not only do they contain several falsities, but they are also inflammatory and encourage disrespect on the part of inmates for the DOC's rehabilitative programming and for the correctional staff running the programs."

From January 2006 to June 2006, DOC officials also refused to deliver several pieces of "third-party" mail to Jones-El, which DOC defines as mail sent to an inmate from a third party (i.e., another inmate or an individual outside of prison) concerning another inmate. The first incident occurred on January 12, 2006, when a WSPF inmate named Cedric Robinson attempted to send Jones-El documents regarding Maurice Fort-Greer, another WSPF inmate. Though delivery was initially denied, prison officials later determined that the documents were related to legal assistance Jones-El was providing to Fort-Greer and should be delivered; on February 17, 2006, Sergeant Postl delivered the mail to Jones-El. On various other occasions from May 2006 to July 2006, however, prison officials refused to deliver other pieces of mail to Jones-El that contained court documents and medical records relating to Fort-Greer, and denied mail from Block that contained court documents regarding John Virgin, the former inmate who died.

Believing that defendants' refusal to deliver copies of his article and court documents regarding other inmates

violated the First Amendment, Jones-El filed this § 1983 action against Sergeant Postl, as well as several other DOC prison officials in the Eastern District of Wisconsin. He alleged that defendants' actions violated his rights to free speech, to freedom of the press and to petition the government.[5] The parties filed cross-motions for summary judgment, and the district court granted defendants' motion. On appeal, Jones-El argues that the DOC's censorship of his article and other mail was not rationally related to any legitimate government interest in prison security or rehabilitation.

## II.

We review the district courts' grant of summary judgment *de novo*. *Jackson v. Frank*, 509 F.3d 389, 391 (7th Cir. 2007) (citation omitted). We construe all facts and draw all reasonable inferences in favor of the nonmoving party in determining whether the moving parties have demonstrated that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986).

---

[5] At the district court, Jones-El also raised a claim that defendants' acts were in retaliation for his past litigation against Wisconsin prisons. On appeal, Jones-El states that his retaliation claim "hinges on," and should rise or fall with the "free speech claim." (Jones-El Br. 23.) We therefore decline to address this claim separately.

As a general rule, prisoners have a constitutionally-protected interest in their incoming and outgoing mail correspondence. *See Frank*, 509 F.3d at 391, *Kaufman v. McCaughtry*, 419 F.3d 678, 685 (7th Cir. 2005) (citing *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999) (citations omitted)). Those outside of prison, too, have an interest in corresponding with prison inmates. S*ee Thornburgh v. Abbott*, 490 U.S. 401, 408, 109 S. Ct. 1874, 1879 (1989) (reaffirming that "publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners."). Prison officials may, however, impose restrictions on prisoner correspondence if those restrictions are "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261 (1987), *Thornburgh*, 490 U.S. at 413, 109 S. Ct. at 1881 (adopting the *Turner* reasonableness standard for regulations on incoming publications sent to prisoners). Such legitimate penological interests might include crime deterrence, prisoner rehabilitation, and protecting the safety of prison guards and inmates. *See Singer v. Raemisch*, 593 F.3d 529 (7th Cir. 2010) (affirming summary judgment in favor of prison officials who restricted role-playing game that mimicked the organization of gangs); *May v. Libby*, 256 Fed. Appx. 825 (7th Cir. 2007) (affirming grant of judgment as a matter of law for prison officials who confiscated inmate's internal grievance form against the prison because it was not unreasonable to perceive letter as a threat); *Kaufman*, 419 F.3d at 685 (affirming district court's dismissal of prison officials who refused to distribute publications deemed pornographic).

In *Turner*, the Supreme Court specifically set forth four factors that courts may weigh in assessing the validity of a prison's regulations: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether the inmates have access to "alternative means" of exercising the restricted right; (3) the "impact [an] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether the regulation is an "exaggerated response to prison concerns."[6] *Turner*, 482 U.S. at 89-91, 107 S. Ct. at 2262.

While the burden of persuasion is on the prisoner to disprove the validity of a regulation, *Overton v. Bazzetta*, 539 U.S. 126, 132, 123 S. Ct. 2162, 2168 (2003) (citations omitted), defendants must still articulate their legitimate governmental interest in the regulation. *Turner*, 482 U.S. at 89, 107 S. Ct. at 2262. Courts are to accord "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and

---

[6] Though each of the factors is relevant in assessing the reasonableness of a regulation, we have previously observed that the first factor serves as a threshold, and the district court need not "explicitly articulate its consideration of each one." *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009) ("Where . . . there is only minimal evidence suggesting that the prison's regulation is irrational, running through each factor at length is unnecessary.").

for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 132, 123 S. Ct. at 2167.

On appeal, both Van den Bosch and Jones-El mainly challenge the DOC's policy regarding incoming inmate mail under the first *Turner* factor, and argue that summary judgment should have been granted in their favor because there is no rational connection between the DOC censorship of incoming prisoner mail and any legitimate penological interest. Plaintiffs' claims overlap to some degree, but we address the alleged constitutional violation for each plaintiff in turn.

### A.  Van den Bosch's Claims

Van den Bosch contends that he was entitled to summary judgment on his First Amendment claim because defendants' censorship of his newsletter was not rationally related to security concerns, but rather motivated by a desire to suppress any speech critical of the prison administration and the conditions of confinement within Wisconsin prisons. The district court did not reach the merits of Van den Bosch's First Amendment claim, and instead concluded that defendants are entitled to qualified immunity because of the uncertainty among district courts about the right to distribute (and receive) *The New Abolitionist*,[7] and the dearth of controlling

---

[7] *Compare Johnson v. Raemisch*, 557 F. Supp. 2d 964 (W. D. Wis. 2008) (holding that prison officials violated prisoner's

(continued...)

authority addressing the censorship of incoming prison newsletters.[8]

The doctrine of qualified immunity insulates public officials from liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)). When evaluating a qualified immunity claim, court must therefore ask whether the "the facts that a plaintiff has alleged . . . make out a violation of a constitutional right," and if so, "whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232, 129 S. Ct. at 816 (citations omitted). The Supreme Court has made

---

[7] (...continued)

First Amendment rights by refusing to deliver March 2007 issue of *The New Abolitionist*) *with West v. Endicott*, No. 06-C-763, 2008 WL 906225 (E. D. Wis. March 31, 2008) (holding that prison officials had not violated prisoner's First Amendment rights by refusing to deliver September 2005 issue of *The New Abolitionist*).

[8] This circuit has not had a recent occasion to address the propriety of barring prisoners from possessing reading materials whose contents do not include gang-related symbols, *see, e.g.*, *Koutnik v. Brown*, 456 F.3d 777 (7th Cir. 2006), racist literature, *see, e.g.*, *Lindell v. McCaughtry*, 115 Fed. Appx. 872 (7th Cir. 2004), or pornography, *see, e.g.*, *Kaufman*, 419 F.3d at 685, but nevertheless purportedly violate internal prison regulations governing incoming inmate mail.

clear that courts are free "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Id.* at 236, 129 S. Ct. at 818. In this case, we need only reach the question of whether the relevant facts "make out a constitutional violation at all." *Id.* We hold they do not.[9]

The district court began its analysis by properly noting that even though Van den Bosch is not incarcerated, the "reasonableness" standard announced in *Turner* must still apply because his claim involves the maintenance of institutional security within a prison setting. The Supreme Court recognized in *Thornburgh v. Abbott* that "publishers who wish to communicate with those who, through subscription, willingly seek their point of view

---

[9] Because we hold that the prison's refusal to dispute the March 2007 edition of the newsletter was a reasonable restriction of Van den Bosch's rights under *Turner*, we need not address qualified immunity. We also note that defendant Westfield is the only individual who allegedly had any personal involvement in the decision to censor Van den Bosch's newsletter. An individual must be found to have personally caused or participated in the alleged constitutional deprivation in order to be held liable under § 1983. *See Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009). Because Van den Bosch's complaint only identifies defendant Westfield as having personally banned the newsletter, Van den Bosch's claims against DOC Secretary Rick Raemisch, Michael Thurmer, Don Strahota, John Dahlke, William Pollard, Kevin Postl, Richard Schneiter, Gary Boughton, Judith Huibregtse and Peter Ericksen must be dismissed.

have a legitimate First Amendment interest in access to prisoners." *Thornburgh*, 490 U.S. at 408, 109 S. Ct. at 1879. At the same time, however, we understand the "delicate balance that prison administrators must strike between the order and security of the internal prison environment and the legitimate demands of those on the 'outside' who seek to enter that environment." *Id.* at 407, 109 S. Ct. at 1878.

The parties' dispute focuses on the first *Turner* factor. We appointed amicus curiae counsel to assist Van den Bosch in his appeal. Amicus counsel argues that while the DOC may have legitimate penological interests in prison security and rehabilitation, the four articles in the March 2007 issue of *The New Abolitionist* fell short of the kind of incitement to violence that courts have previously identified as warranting censorship. Defendants reject this assertion and argue that the DOC had valid reasons for determining that the newsletter was "injurious" under the Wisconsin Administrative Code. Relying almost exclusively on the affidavit of defendant Westfield, defendants contend that the newsletter "went beyond mere criticism," had the potential to endanger prison guards by encouraging violent self-help remedies, and would likely undermine prisoners' incentives to work toward rehabilitative goals. For instance, according to defendant Westfield, the article describing the Wisconsin Parole Commission and Program Review Committee as "clueless" and "totalitarian" had the potential to "encourage disrespect on the part of inmates," and the article that claimed the PRC used "manipulative tactics" and "fabricated stories" may cause security issues by

"encourag[ing] distrust of staff and unrest among inmates"
if they were led to believe they will never be eligible
for parole.

On recent occasions we have examined efforts by
prisons to restrict inmates' incoming mail, most
frequently in the context of restrictions on gang-related
or other violent materials. In *Singer v. Raemisch*, 593 F.3d
529 (7th Cir. 2010), an inmate brought suit after prison
officials confiscated publications related to the role-
playing game Dungeons and Dragons. The prison deter-
mined that the game posed a threat to prison security
through its promotion of violence and "escapist behav-
ior," and we agreed that the prison's policy regarding
the game was reasonably related to valid penological
interests in maintaining institutional security. *Id.* at 537-
38. Similarly, in *Mays v. Springborn*, 575 F.3d 643 (7th Cir.
2009), we affirmed a district court's grant of summary
judgment for prison officials who removed pages from
an issue of *Vibe* magazine containing alleged gang signs.
*Id.* at 646, 649. We have also previously upheld a
prison's decision to ban incoming commercial photo-
graphs, even when seemingly benign. *See Frank*, 509 F.3d
at 391-92 (affirming summary judgment for prison
officials who refused to deliver mail-ordered com-
mercial photographs of celebrities due to burden on
prison staff in evaluating each photograph for forbidden
content).

Van den Bosch has not presented any evidence to rebut
defendants' contention that the March 2007 issue of the
newsletter contains misleading information, encourages
distrust of prison staff, and could potentially undermine

the prison's rehabilitative initiatives. Amicus counsel urges that the prison officials' justifications for censoring the newsletter are neither neutral nor rationally related to security, and suggests that the pretextual nature of the DOC's justifications for confiscating the newsletter is underscored by the fact that none of the purported security threats have ever materialized (even though some inmates inadvertently received the newsletter and it was eventually made available to all inmates in May 2008). We find this argument unpersuasive. The essential question is not whether the threats were eventually carried out, but whether plaintiff has shown that it was not reasonable for defendants to perceive the newsletter as a potential threat to rehabilitation and security. *See Libby*, 256 Fed. Appx. at 829.

Amicus counsel insists that even if the DOC censored the newsletter due to its potential to compromise institutional security or prisoner rehabilitation, the prison officials' decision was an "exaggerated response" to those concerns. Counsel cites our decision in *Lindell v. McCaughtry*, 115 Fed. Appx. 872 (7th Cir. 2004) (unpublished order), where a Wisconsin inmate sued after prison officials seized and "lost" his copy of *Pagan Revival*, an avowedly racist magazine promoting white supremacy. In that case, we upheld the prison's ban on publications that advocated violence and presented a security threat. Presumably, amicus counsel presents the content of the magazine involved in *Lindell* as the type of inflammatory material that is properly banned—as opposed to the content of *The New Abolitionist*, which counsel characterizes as encouraging political, not

violent, action by inmates and their family members. We are satisfied that the underlying current of concern running through both this case and *Lindell* is the same: prisons maintain broad discretion in prohibiting material in prison that potentially endangers institutional security. *See Thornburgh*, 490 U.S. at 413, 109 S. Ct. at 1881. The question of whether censorship is an appropriate measure to protect security and encourage rehabilita-tion—or, to the contrary, is an "exaggerated response" to institutional concerns—requires a context-specific deter-mination that cannot be resolved by simply evaluating the level of explicit violence within a given publication. In this case, the Westfield affidavit, though arguably vague in certain respects, does identify several passages in the March 2007 newsletter that may reasonably en-courage distrust of prison staff and threaten prison secu-rity. Plaintiff's disagreement with defendant Westfield's assessment is insufficient to establish that confiscation of the newsletter was not reasonably related to legitimate penological interests.

### B.  Jones-El's Claims

Jones-El argues that the district court erred in granting summary judgment for defendants because the prison officials' refusal to deliver copies of his article in *The New Abolitionist* and court documents related to other inmates cannot not pass muster under the first prong of *Turner*. The district court indeed afforded the prison officials significant deference, and found that defendants' decision to refuse delivery of Jones-El's mail did not

violate his First Amendment rights because it was reasonably related to the prison's interest in maintaining prison discipline and security. We agree with the district court.

As in Van den Bosch's case, defendants here offer the affidavit of defendant Westfield to support their contention that refusing to deliver copies of Jones-El's article was reasonably related to legitimate penological interests. Defendant Westfield pointed to several statements in Jones-El's article that he urged contained false information, encouraged disrespect for prison officials, and were fundamentally at odds with the rehabilitative goals of prison in that they suggest that inmates are in segregation through no fault of their own but are instead victims of an unjust penal system. "There is no question that the rehabilitation of inmates is a legitimate interest of penal institutions," *Koutnik*, 456 F.3d at 784, and the challenge in cases such as this one is in evaluating whether the prison's enforcement of its restrictions was "no greater an infringement upon [Jones-El's rights] . . . than was necessary to protect the [prison's] interest." *Id.* (quoting *Rios v. Lane*, 812 F.2d 1032, 1037 (7th Cir. 1987)).

Jones-El's article frequently draws upon DOC statistics about inmate suicide to support his argument that the segregated confinement units in Wisconsin prisons operate as a *de facto* death penalty system through their torturous conditions. He suggests, further, that Wisconsin inmates are placed in segregation for minor offenses and for longer periods of time than inmates in other states. Though he does not expressly encourage his

fellow prisoners to use violence, he does explicitly state that Wisconsin prison officials "are literally killing" prisoners in segregation by creating conditions in which the inmates have no choice but to commit suicide. It is not unreasonable for officials to legitimately conclude that such a statement—whether deliberate hyperbole or intended to be taken literally—runs afoul of a prison's practical need to discourage misinformation that may needlessly encourage unrest.

Jones-El notes that he only requested copies of his article to send to other publications. Again, however, prison officials could have legitimate concerns that once such copies entered the prison system, such material might be "expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct." *Thornburgh*, 490 U.S. at 412-13, 109 S. Ct. at 1881 ("The problem is not . . . in the individual reading the materials in most cases. The problem is in the material getting into the prison.") Jones-El himself appears to have envisioned such a result: he argued before the district court that he intended that the article serve as encouragement for his fellow inmates to join him in petitioning the Wisconsin legislature for prison reform.

Amicus counsel argues that defendant Westfield's assertions about Jones-El's article are too speculative to deserve consideration and that many of the criticisms about the prison system presented in Jones-El's article were previously published by other articles in other magazines that were allegedly allowed in the prison

"without incident." As noted previously, however, prison officials are permitted to take preventative measures before violence ensues and not wait for injury to occur. In the words of the *Thornburgh* Court, it is "rational" for prison officials to "exclude materials that, although not necessarily 'likely' to lead to violence, are determined by the warden to create an intolerable risk of disorder under the conditions of a particular prison at a particular time." 490 U.S. at 417, 109 S. Ct. at 1883.

Regarding Jones-El's challenge to defendants' restriction of "third-party" mail, amicus counsel appears to assert that the regulation is unconstitutional not merely as applied to Jones-El, but also on its face. Amicus contends that the policy cannot withstand scrutiny under *Turner* because it extends to all incoming mail that concerns another inmate, regardless of the context. In response, defendants observe that while prisoners do not enjoy unfettered access to documents pertaining to other fellow prisoners, inmates may indeed correspond directly with each other (and even provide legal assistance to one another), and are merely prohibited from corresponding through an intermediate third party. Defendants have offered several justifications for such a restriction, but the primary concern is prisoner safety. Defendants submit that inmates may attempt to gather information about other inmates' crimes—particularly those inmates who have been convicted of sex-related crimes—and the distribution of such information may threaten the security and operation of the entire prison system. Moreover, the information contained in other court documents, such as

criminal complaints, may identify victims or gang affiliations, the disclosure of which could place inmates at risk for physical harm. Such safety concerns are legitimate and neutral. *See Turner*, 482 U.S. at 92, 107 S. Ct. at 2263 (concluding that where correspondence rights of prisoners can be "exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike[,] . . . the choice made by corrections officials [to censor mail] . . . should not be lightly set aside by the courts.").

Amicus counsel asserts that defendant Westfield's affidavit is nevertheless too conclusory to justify censorship of all third-party mail, but the case counsel cites, *Jackson v. Pollard*, 208 Fed. Appx. 457 (7th Cir. 2006), is readily distinguishable. In *Jackson*, a prisoner filed a § 1983 suit after prison officials refused to deliver certain materials, including the hard copy of an e-mail message responding to the prisoner's personal online pen pal request. *Id.* at 459. The DOC argued that prohibiting inmates from receiving e-mail responses to their personal websites protects the public, but we found a genuine dispute of fact on the issue of whether the challenged regulation advanced such a goal. We noted that the prison did not ban delivery of handwritten responses to inmates' online communications, and that prison officials had not explained how delivery of printed e-mail messages created greater danger than did delivery of those handwritten materials. No such inconsistency is presented here, where defendants have categorically banned the receipt of "third-party" mail that concerns

another inmate, regardless of the technological device used to send such information.

Amicus counsel insists that the DOC should permit exceptions to the rule regarding third-party mail specifically for legal mail relating to litigation against DOC, and could easily apply a narrower censorship policy by prohibiting inmates from receiving only those third-party legal materials that pose a genuine threat to security. While the DOC's asserted penological objectives—maintaining prison security, order and rehabilitation—might very well be achieved with a narrower policy, the absence of an ideal policy does not render the policy that officials have adopted unconstitutional. Determining which materials constitute a "genuine threat to security" would present no easier a task for courts currently faced with evaluating the reasonableness of a given regulation, and such a determination is, at bottom, a decision prison administrators are uniquely situated to make. As the Court observed in *Turner*: "Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Turner*, 482 U.S. at 89, 107 S. Ct. at 2262. The court is satisfied that DOC's current regulation regarding third-party mail is not "an exaggerated response to prison concerns" and Jones-El has not established an "obvious, easy alternative" to the regulation regarding third-party mail. *Id.* at 90, 107 S. Ct. at 2262.

Nor are we persuaded that the DOC's ban on third-party mail is unconstitutional as applied to Jones-El.

Amicus counsel argues that the DOC's policy has inter-
fered with Jones-El's specific efforts to raise awareness
about prison conditions and assist other inmates in civil
rights litigation. The DOC's prohibition on third-party
mail may well make it more difficult for multiple
inmates to work collaboratively, but the policy has
not in fact prevented Jones-El from providing legal assis-
tance to other prisoners. Officials did refuse to
deliver several pieces of mail containing court files and
medical records regarding another inmates when sent by
third parties, but Jones-El points to no instance in which
he was denied access to legal mail concerning an indi-
vidual inmate when sent by the inmate himself. Jones-
El has in fact assisted inmates in at least two other
prisoner-rights cases. *See Fort-Greer v. Daley*, 228 Fed.
Appx. 602 (7th Cir. 2007) (Wisconsin inmate brought § 1983
action claiming two prison physicians denied him ade-
quate medical care); *Jones-El v. Berge*, No. 00-C-421-C, 2003
WL 23109724 (W.D. Wis. Nov. 26, 2003) (ordering DOC
to implement air condition system for cooling inmate
cells), *aff 'd*, 374 F.3d 541 (7th Cir. 2004). Thus, even under
the second *Turner* factor, "other avenues" remain
available for inmates such as Jones-El seeking to
provide and receive legal assistance from one another,
because they may still correspond directly as long as
a third party is not involved. *Turner*, 482 U.S. at 90, 107
S. Ct. at 2262 ("Where 'other avenues' remain available
for the exercise of the asserted right . . ., courts should
be particularly conscious of the 'measure of judicial
deference owed to corrections officials . . . in gauging the
validity of the regulation.'") (quoting *Jones v. North*

*Carolina Prisoners' Union*, 433 U.S. 119, 131, 97 S. Ct. 2532, 2540 (1977); *Pell v. Procunier*, 417 U.S. 817, 827, 94 S. Ct. 2800, 2806 (1974); *see also Overton*, 539 U.S. at 135, 123 S. Ct. at 2169 ("Alternatives . . . need not be ideal . . .; they need only be available."). The district court did not err in finding that the DOC's policy restricting prisoners' access to third-party mail did not violate Jones-El's First Amendment rights.

## III.

For the foregoing reasons, the judgments of the district courts are affirmed.