NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-653                                          Appeals Court

COMMONWEALTH  vs.  JOHN ECKER.

No. 15-P-653.

Hampden.     June 5, 2017. - September 13, 2017.

Present:  Sullivan, Henry, & Shin, JJ.


Practice, Criminal, Motion to suppress, Instructions to jury.
    Constitutional Law, Imprisonment, Freedom of speech and
    press.  Malice.  Criminal Harassment.  Harassment
    Prevention.  Stalking.  Attempt.


    Indictments found and returned in the Superior Court
Department on March 5, 2014.

    A pretrial motion to suppress evidence was heard by Mary-
Lou Rup, J.; a motion for reconsideration was considered by C.
Jeffrey Kinder, J., and the cases were tried before him.


    Deborah Bates Riordan for the defendant.
    Bethany C. Lynch, Assistant District Attorney, for the
Commonwealth.


    SHIN, J.  A Superior Court jury convicted the defendant of

stalking, two counts of criminal harassment, and attempt to

commit a crime (violation of a harassment prevention order).[1] On appeal the defendant argues that (1) the motion judge should have suppressed evidence of a letter that he wrote from prison because the letter was seized in violation of his rights under the First Amendment to the United States Constitution, (2) the trial judge gave an erroneous jury instruction on the definition of "malicious" conduct, as it pertains to stalking and criminal harassment, and (3) the evidence was insufficient to prove that the defendant was guilty of those offenses. We affirm.

Background. The convictions at issue arose from interactions that the defendant had with two victims. We summarize the facts relating to each victim in turn, viewing the evidence and the reasonable inferences therefrom in the light most favorable to the Commonwealth. See Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979).

Victim 1 -- Miranda.[2] In May of 2013, Miranda interviewed and hired the defendant for a position at Burger King. The following day, the defendant returned to see Miranda, claiming to have questions about company policy. Miranda spoke to him for a couple of minutes.

---

[1] The jury also convicted the defendant of intimidating a witness and seven counts of violating a harassment prevention order. He does not challenge those convictions on appeal.

[2] A pseudonym. The defendant was convicted of criminal harassment with respect to this victim.

The defendant returned the next day looking for Miranda, but she was not working. The defendant then asked another employee for Miranda's phone number and schedule. When the employee would not give him that information, he requested that she call Miranda for him, which she declined to do. Later the same week, the defendant called Miranda at work and asked to set up a time to go over the employee manual and company policy. Although Miranda directed him to speak with the owner instead and gave him the main office number, he showed up again the next day looking for her.

Two days later, Miranda received a letter from the defendant on her home fax machine, which was connected to her home phone line. She thereafter received the same letter by mail at her home address. The defendant began the letter by stating, "It's your CIA boyfriend and hopefully your future husband." He then stated, "The most important issue that we need to clarify is the relationship between you and I. From the first meeting on, our attraction to each other was well defined indeed. You can't hide something like that and we need to address it immediately." The defendant told Miranda that he had sent her text messages asking her to marry him and that he needed to see her "to discuss this matter and clearly define [their] relationship." He also stated that, because the company's policy prohibited them from dating, one of them needed

to be reassigned so that they could "continue with the relationship."

Miranda was "terrified" that the defendant knew her home address and phone number and "was afraid that he[] [was] going to show up at [her] house." She applied for and obtained a harassment prevention order against the defendant, after which he ceased contact with her.

Victim 2 -- Caren.[3] The summer of the same year, the defendant began focusing on Caren, who often walked by his house on her way to visit her grandmother. Caren was then sixteen years old, while the defendant was around fifty-three years old. The defendant would routinely stare at Caren and call out, "[H]ey baby," "[H]ey beautiful," and "[H]ey sexy" to her. He also yelled at her from across the street to come inside his house for tea.

One day in August of 2013, an envelope addressed to Caren arrived in the mail at her grandmother's house. It contained the defendant's business card with three questions written on the back: "Do you need a ride? Would you like to go to lunch, the Big E, the movies? Would you like me to take you shopping at Macy's?" Caren's mother called the defendant, asked him to leave Caren alone, and hung up the phone. The defendant called

---

[3] A pseudonym. The defendant was convicted of both stalking and criminal harassment with respect to this victim.

back and asked for permission to date Caren, to which her mother replied, "Absolutely not.  She's sixteen years old."  The defendant responded that he had not done anything illegal, then paused and stated, "As of yet."  After another pause, he stated, "I don't plan on it."  Caren's mother "panicked" and applied for and obtained a harassment prevention order for herself and Caren against the defendant.

Thereafter, the defendant began sending letters to Caren.[4] In the first letter, the defendant asked for "another chance," writing, "I will care for you, suck your toes and everything else until death do us part.  Your indentured servant's husband's tongue awaiting your command."  Over the following weeks, the defendant sent Caren several more letters, in which he declared his love for her, said that he had granted her durable power of attorney so that she could be in charge of his financial affairs, and suggested that they consider moving to Canada to "start a life together."  In another letter the defendant shared details about his convictions for attempted murder and for being a felon in possession of a firearm, spoke of a "sexually explicit" letter he had sent to a woman whom he referred to as his "French-American CIA soulmate," and stated that he once had visions of that woman being "trapped and beaten

---

[4] The defendant also called Caren's home eight times between October 19 and November 5, 2013.

and stabbed in the vagina." The defendant explained that he was sharing this information with Caren because she "need[ed] to know and be aware of who [she is] sharing a bed with along with any potential safety risks involved."

Discussion. 1. Motion to suppress. While the defendant was in pretrial detention at the Hampden County house of correction (HCHC), the Springfield police department notified HCHC officials that he was sending letters to Caren in violation of the harassment prevention order that was then in place. HCHC's written policies, a copy of which was provided to the defendant, authorized the inspection of inmates' outgoing nonprivileged correspondence when "such action is necessary to maintain security or order in the facility or protect the physical safety of an individual." The policies also authorized disapproval of outgoing correspondence "the contents of which fall as a whole or in significant part" into certain categories, including "[c]riminal activity or plans for criminal activity." Pursuant to these policies, prison officials began inspecting the defendant's outgoing nonprivileged mail and confiscated any letters directed to or regarding Caren.

The defendant moved to suppress evidence of the confiscated letters, claiming a violation of his First Amendment rights. The judge denied the motion, concluding that prison officials properly monitored the defendant's mail based on "specific

information that the defendant was violating an active antiharassment order" and to "investigat[e] if the defendant was engaging in such criminal activity and [to] prevent[] the defendant from committing such conduct."  On appeal the defendant challenges the judge's ruling with respect to only one letter, which he addressed to a flower shop, requesting that flowers, gifts, and a card be sent to Caren.[5]  In reviewing this challenge, "we accept the judge's subsidiary findings of fact absent clear error but 'conduct an independent review of h[er] ultimate findings and conclusions of law.'"  Commonwealth v. Scott, 440 Mass. 642, 646 (2004), quoting from Commonwealth v. Jimenez, 438 Mass. 213, 218 (2002).

Although "prison inmates retain certain constitutional rights," those rights are necessarily limited by "[t]he fact of confinement as well as the legitimate goals and policies of the penal institution."  Cacicio v. Secretary of Pub. Safety, 422 Mass. 764, 770 n.10 (1996), quoting from Bell v. Wolfish, 441 U.S. 520, 545-547 (1979).  Thus, a policy authorizing censorship of inmate mail does not run afoul of the First Amendment so long as it is "reasonably related to legitimate penological interests."  Commonwealth v. Jessup, 471 Mass. 121, 130-131 (2015), quoting from Turner v. Safley, 482 U.S. 78, 89 (1987).

---

[5] This letter was the basis of the defendant's conviction for attempting to commit a crime.

Here, the defendant does not argue that the HCHC policies are unconstitutional on their face. Instead, he challenges the policies as applied, claiming that his letter could not be seized without a warrant because it did not threaten the security of the facility or the physical safety of any person. We disagree. Inspecting the defendant's mail to prevent him from violating an active harassment prevention order was reasonably related to the legitimate penological interests of maintaining order and preventing commission of a crime. See Van den Bosch v. Raemisch, 658 F.3d 778, 785 (7th Cir. 2011), quoting from Turner, 482 U.S. at 89 ("Prison officials may . . . impose restrictions on prisoner correspondence if those restrictions are 'reasonably related to legitimate penological interests,'" including "crime deterrence"). See also O'Keefe v. Van Boening, 82 F.3d 322, 326 (9th Cir. 1996) ("[T]he prevention of criminal activity and the maintenance of prison security are legitimate penological interests which justify the regulation of both incoming and outgoing prisoner mail").[6] See generally Jessup, 471 Mass. at 131-133. Moreover, we reject the defendant's contention that it was arbitrary and capricious for HCHC officials to open all of his nonprivileged mail, rather than limiting their inspection to letters addressed to Caren.

---

[6] For someone who has been convicted of a crime, "prisoner rehabilitation" would be another legitimate penological interest. Van den Bosch, 658 F.3d at 785.

It was reasonable to presume that the defendant might try to contact Caren through third parties, especially given that HCHC's assistant superintendent expressly warned the defendant to stop communicating with Caren and her mother. The motion to suppress the letter to the flower shop was therefore properly denied.

2. Jury instruction. The crimes of criminal harassment and stalking both require proof that the defendant engaged in "malicious" conduct.[7] Relying on the model jury instruction, the trial judge instructed the jury as follows: "An act is done maliciously if it's done intentionally and without justification or mitigation, and any reasonably prudent person would have foreseen the actual harm that resulted." See Instructions 6.640 and 6.680 of the Criminal Model Jury Instructions for Use in the District Court (2011). The defendant argues that, under Commonwealth v. McDonald, 462 Mass. 236, 242 (2012), the judge should have instead instructed that whether an act is malicious depends on the defendant's subjective state of mind and requires

_____

[7] Specifically, the criminal harassment statute requires proof that the defendant "willfully and maliciously engage[d] in a knowing pattern of conduct or series of acts over a period of time directed at a specific person, which seriously alarm[ed] that person and would cause a reasonable person to suffer substantial emotional distress." G. L. c. 265, § 43A(a), as amended by St. 2010, c. 92, § 10. The stalking statute requires substantially the same proof and requires further that the defendant "ma[de] a threat with the intent to place the person in imminent fear of death or bodily injury." G. L. c. 265, § 43(a), as appearing in St. 2014, c. 284, § 85.

proof of specific intent to harm the victim.  Because the defendant preserved this issue for appeal, we review for prejudicial error.  See Commonwealth v. Allen, 474 Mass. 162, 168 (2016).

We discern no error in the judge's instruction.  In Commonwealth v. Paton, 63 Mass. App. Ct. 215, 219 (2005), we specifically rejected the argument that a defendant must have "act[ed] out of 'cruelty, hostility, or revenge'" to be guilty of criminal harassment.  Instead, concluding that "[w]e need not be confined to only those particular states of mind," we defined a malicious act to include an "intentional, wrongful act performed against another without legal justification or excuse."  Ibid., quoting from Black's Law Dictionary 977 (8th ed. 2004).

Likewise, in Commonwealth v. O'Neil, 67 Mass. App. Ct. 284, 293 (2006), we concluded that "the statute's requirement of malice" is satisfied where the defendant's "conduct was intentional and without justification or mitigation, and any reasonably prudent person would have foreseen the actual harm that resulted."  As in Paton, we rejected an invitation to define malice to "include the element of hatred, spite, grudge, or ill will," holding that criminal harassment does not require proof of specific intent.  Id. at 291-292.  "The malice required," we reiterated, "is not a feeling of ill-will toward

the person threatened, but the wilful doing of the act with the illegal intent." Id. at 292, quoting from Commonwealth v. Buckley, 148 Mass. 27, 28 (1888).

The defendant does not dispute that the judge's instruction comported with Paton and O'Neil but claims that McDonald changed existing law. In support, he relies on the following quotation from a parenthetical in McDonald: "malicious acts are 'done with an evil disposition, a wrong and unlawful motive or purpose; the wilful doing of an injurious act without lawful excuse.'" 462 Mass. at 242, quoting from Paton, 63 Mass. App. Ct. at 219. But this parenthetical quotation does not have the import that the defendant gives it. The defendant disregards the latter part of the quotation -- defining a malicious act as "the wilful doing of an injurious act without lawful excuse" -- which, as he acknowledged at oral argument, conveys essentially the same message as the judge's instruction. Furthermore, McDonald takes the quotation from Paton, which, again, rejected a definition of malice that would require proof of specific intent. McDonald also cites O'Neil with approval in the same paragraph. See ibid.

In short, we see nothing in McDonald that overrules or calls into doubt our decisions in Paton and O'Neil. As the judge's instruction was consistent with Paton and O'Neil, there was no error.

3.  Sufficiency of the evidence.  The defendant's sufficiency challenge is limited to the element of malice.  We review the evidence in the light most favorable to the Commonwealth to determine whether "any rational trier of fact could have found [that] . . . element[] of the crime beyond a reasonable doubt."  Latimore, 378 Mass. at 677.

The defendant mainly argues that there was no evidence that he harbored ill will towards the victims.  As discussed above, however, ill will is not required to prove stalking or criminal harassment.  Although the defendant also claims that the evidence was insufficient to prove malice under the instruction as given, he provides no reasoning in support, other than conclusory assertions that his actions were "innocuous" and not "malicious."

In any event, we conclude that the evidence was sufficient for a rational jury to find that the defendant acted maliciously.  With respect to Miranda, after meeting her once in a professional setting, the defendant persisted in contacting her, located her home phone number and address, and then sent her a letter claiming to be her "CIA boyfriend" and discussing an imaginary romantic relationship between them.  With respect to sixteen year old Caren, the defendant committed numerous acts that the jury could have found to be malicious, including sending her letters in which he addressed her as his romantic

and sexual partner, gave details about his criminal history, suggested leaving the country together, and described violent fantasies of a woman being beaten and stabbed.  The defendant's conduct was intentional and without justification or mitigation, and we are satisfied that a reasonably prudent person would have foreseen that both victims would have been harmed by his behavior.  See O'Neil, 67 Mass. App. Ct. at 293.  Thus, viewed in the light most favorable to the Commonwealth, the evidence was sufficient to support the defendant's convictions for stalking and criminal harassment.  See Paton, 63 Mass. App. Ct. at 220 ("defendant's staring at the victim in the bar without speaking and then unexpectedly appearing in proximity to her in other places had an ominous, menacing, even sinister quality" and "constitute[d] legally malicious conduct"); O'Neil, 67 Mass. App. Ct. at 291, 293 (defendant acted maliciously by sending victim numerous letters that presumed a relationship between them where none existed).

Judgments affirmed.